In the Matter of the Accounting of NEW YORK TRUST COMPANY, as Committee of WALTER LEWISOHN, an Incompetent Person, Now Deceased.

SELMA FARR, Individually and as Executrix of WALTER LEWISOHN, Deceased, et al., Appellants; NEW YORK TRUST COMPANY, Respondent.

Argued June 11, 1945; decided October 11, 1945.

*Nathan L. Miller, George W. Alger* and *Lewis F. X. Cotignola* for appellants. I. The mortgage investment was not secured by " unencumbered real property " as required by section 21 of the Personal Property Law, hence the investment of trust funds therein was illegal. (*Wetmore* v. *Bruce,* 118 N. Y. 319; *Forster* v. *Scott,* 136 N. Y. 577; *Bull* v. *Burton,* 227 N. Y. 101; *Chesebro* v. *Moers,* 233 N. Y. 75; *Isaacs* v. *Schmuck,* 245 N. Y. 77; *Dieter-len* v. *Miller,* 114 App. Div. 40; *Matter of Haydock,* 158 Misc. 404; *Matter of Bristol* v. *Buck,* 201 App. Div. 100, 234 N. Y. 504.) II. Apart from noncompliance with the provisions of section 21 of the Personal Property Law, the mortgage investment was improvident as a matter of law. (*Matter of Dalsimer,* 251 App. Div. 385; *Delafield* v. *Barret,* 270 N. Y. 43; *Matter of Jacobs,* 152 Misc. 139; *Matter of Randolph,* 150 App. Div. 902, 207 N. Y. 685; *Durant* v. *Crowley,* 197 App. Div. 540.) III. The trust company owed a duty of undivided loyalty to its *cestui que trust.* It could not purchase from its president, his wife, or his associates, the mortgage which it participated among its *cestuis que trustent.* Its position of divided loyalty was aggravated by its acquisition of the mortgage subject to covenants benefiting its president in his ownership of an adjoining parcel dominating the mortgaged premises. (*Matter of Ryan,* 291 N. Y. 376; *City Bank Farmers Trust Co.* v. *Cannon,* 291 N. Y. 125; *Albright* v. *Jefferson County Nat. Bank,* 292 N. Y. 31; *Meinhard* v. *Salmon,* 249 N. Y. 458; *Wendt* v. *Fischer,* 243 N. Y. 439; *Munson et al.* v. *S. G. & C. R. R. Co. et al.,* 103 N. Y. 58; *Ten Eyck* v. *Craig et al.,* 62 N. Y. 406; *Pyle* v. *Pyle,* 137 App. Div. 568, 199 N. Y. 538; *Dutton* v. *Willner,* 52 N. Y. 312; *Jackson* v. *Smith,* 254 U. S. 586; *Chicago &c. Ry.* v. *Des Moines &c. R.,* 254 U. S. 196; 2 Scott on Trusts, pp. 856, p. 73, 877, 909, 910; Scott, Trustees' Duty of Loyalty, 49 Harv. Law Rev. 521, 541; Restatement of Law on Trusts, § 170, p. 436, comment i; Bogert on Trusts and Trustees

[1935], § 543.) IV. Respondent has not excused its self-dealing. (*Wendt* v. *Fischer*, 243 N. Y. 439; *Matter of Ryan*, 291 N. Y. 376; *Munson* v. *Syracuse, G. & C. R. R. Co.*, 103 N. Y. 58; *Albright* v. *Jefferson County Nat. Bank*, 292 N. Y. 31.) V. Respondent seeks refuge on the ground that the referee has found as a fact that Mrs. Gibson, and not Mr. Gibson, was the owner· of the two-ninths participation. The evidence overwhelmingly establishes that Mr. Gibson through his holding corporation was in fact the owner of the two-ninths participation. Under those circumstances the finding is not conclusive upon us on this appeal. (*Weigand* v. *United Traction Co.*, 221 N. Y. 39; *Pollock* v. *Pollock*, 71 N. Y. 137; *Laidlaw* v. *Sage*, 158 N. Y. 73; *Fealey* v. *Bull*, 163 N. Y. 397; *Matter of Case*, 214 N. Y. 199; *Matter of Burnham*, 234 N. Y. 475; *State Bank* v. *Siff*, 254 N. Y. 627; *Matter of Bennett*, 238 N. Y. 583; *Russ* v. *Russ*, 263 N. Y. 625; *Bank of United States* v. *Manheim*, 264 N. Y. 45.) VI. Once the possibility of conflicting interest or divided loyalty is shown, the inquiry is stopped. Equity will not search the transaction to determine whether it was fair. (*Wendt* v. *Fischer*, 243 N. Y. 439; *Munson* v. *Syracuse G. & C. Rr. Co.*, 103 N. Y. 58; *Matter of Ryan*, 291 N. Y. 376; *Albright* v. *Jefferson County Nat. Bank*, 292 N. Y. 31; *Matter of Hufnagel*, 258 App. Div. 1088, 259 App. Div. 833.) VII. Respondent has not shown that the investment was a legal investment complying with the provisions of section 21 of the Personal Property Law. VIII. The claim of improvidence was litigated below. The record establishes improvidence as a matter of law. IX. The releases and consent to the decree on accounting before vacatur thereof do not bar the appellants on this appeal. (*Meinhard* v. *Salmon*, 249 N. Y. 458; *Matter of Young*, 249 App. Div. 495, 274 N. Y. 543; *Matter of Ryan*, 291 N. Y. 376; *Stewart* v. *Wyoming Ranche Co.*, 128 U. S. 383.) X. *Matter of Schoenewerg* (160 Misc. 819, 277 N. Y. 424) does not aid respondent. XI. The order appealed from should be reversed and an order made directing (a) that the committee be surcharged with the amount expended in purchasing the investments with interest at an equitable rate, (b) denying the committee its commissions on the prin-

cipal of the mortgage investment and (c) requiring the committee to pay objectants' counsel fees in the courts below and in the Court of Appeals. (*Albright* v. *Jefferson County Nat. Bank,* 292 N. Y. 31; *Cook* v. *Lowry,* 95 N. Y. 103; *Matter of Rutledge,* 162 N. Y. 31; *Matter of Caffrey,* 254 App. Div. 684; *Matter of Flood,* 133 Misc. 72; *Matter of Hidden,* 243 N. Y. 499.)

*Orison S. Marden, Lowell Wadmond* and *Adolph G. Stahl, Jr.,* for respondent. I. The evidence shows conclusively that the purchases by the trust company as committee of Kellenworth participations were not tainted by self-dealing. II. The restrictions did not render the mortgage an illegal investment for trust funds. (Personal Property Law, § 21; *Bull* v. *Burton,* 227 N. Y. 101; *Matter of City of New York [Tunnel Street],* 160 App. Div. 29, 212 N. Y. 547; *Matter of Stupack,* 274 N. Y. 198.) III. The claim of improvidence was not litigated below and is not sustained by the record. (*Persky* v. *Bank of America National Association,* 261 N. Y. 212.) IV. In considering this case, the restrictions should of course be looked upon with the eyes of 1923–1928, not of 1945. (*Matter of Clark,* 257 N. Y. 132.) V. The soundness of the loan is attested by the evidence and the findings. The burden of proving that the committee did not exercise proper care and prudence in acquiring the Kellenworth participations, rested on the objectants. (*Matter of Clark,* 257 N. Y. 132; *Purdy* v. *Lynch,* 145 N. Y. 462.) VI. The referee should have permitted respondent to show that the restrictions had been removed prior to trial. (*Matter of Adriance,* 145 Misc. 345; *Matter of Poillon,* 163 Misc. 897; *Irving Trust Co.* v. *Natica, Lady Lister-Kaye,* 157 Misc. 32.) VII. A fiduciary seeking to be discharged of liability deals " at arm's length " with the parties beneficially interested, whether such discharge is by judicial accounting or by voluntary release. In the absence of fraud, a release given under such circumstances is conclusive upon the beneficiary, even though the fiduciary would certainly have been surcharged if the beneficiary had actually pressed objections. (*Matter of Schoenewerg,* 277 N. Y. 424; *Matter of James,* 173 Misc. 1042, 262 App. Div. 703, 287 N. Y. 645; *Matter of Stone,* 272 N. Y. 121; *Matter of Salomon,*

175 Misc. 264.) VIII. The objectants are bound by the executrix' consent to the entry of the August 23, 1939, decree. (*Fidelity & Deposit Co.* v. *Queens Co. Trust Co.*, 226 N. Y. 225; *Matter of Sielcken,* 162 Misc. 54; *Matter of White,* 182 Misc. 223, 268 App. Div. 759, 293 N. Y. 767.)

LOUGHRAN, Ch. J.   This proceeding for final judicial settlement of the account of the New York Trust Company as committee of the person and property of Walter Lewisohn, an incompetent person, was brought shortly after Mr. Lewisohn's death.   Objections filed by his estate and by the beneficiaries thereof are aimed at a purchase by the committee of a $277,500 interest in a $375,000 real estate mortgage.   The history of the case goes back to 1920.

In that year, a syndicate composed of four men of wealth and business prestige bought 282 acres of land on the north shore of Long Island as a means of enabling each of them to acquire a site for the establishment of a select and spacious country estate.   The purchase price was $1,200,000.   A down payment of $100,000 cash was made by the syndicate; the seller took back a purchase money mortgage for the balance of $1,100,000; and the syndicate members gave their respective personal bonds for an aggregate equal amount.

After the land had been subdivided and improved, sales of parcels thereof were made to the syndicate members and to others for a total of $623,260, leaving six parcels comprising 182 acres still on hand when, in 1923, the syndicate members decided to convert that remaining area into a golf club premises. Thereupon Kellenworth Corporation — which was organized to own and operate the property as such a club — paid $547,000 for it — $247,000 in cash and the balance of $300,000 by a purchase money mortgage.   This $547,000 payment and the $623,260 of proceeds of prior sales supplied to the syndicate members a fund of $1,170,260 for the satisfaction of their several personal liabilities in respect of the $1,100,000 balance of the original purchase price.   In 1925, the syndicate paid off that balance and at the same time allotted the $300,000 Kellenworth mortgage among the syndicate members in the form of undivided par-

ticipations that were proportioned to their respective syndicate contributions.

The maturity of the $300,000 Kellenworth mortgage had been set for July 31, 1928. In January, 1928, the trust company agreed to make to Kellenworth Corporation a first mortgage loan of $375,000. On the closing of that agreement on September 28, 1928, the $300,000 Kellenworth mortgage was acquired by the trust company through the syndicate and was extended for five years after being consolidated with another mortgage which Kellenworth Corporation gave to the trust company to secure a new advance of $75,000.

The trust company did not invest in that $375,000 consolidated mortgage for its own account. Its purchase thereof was made — as all parties agree — " for participation among sundry trusts." At the time of that transaction, the trust company was committee of the property of Mr. Lewisohn — a fiduciary engagement which it undertook on September 14, 1928. On that date, the scheduled value of Mr. Lewisohn's property was $406,878.85. On October 3, 1928, the trust company as his committee purchased a $240,000 participation in the $375,000 consolidated mortgage and, as such committee, purchased a further $37,500 participation therein on October 17, 1928. Notice of the fact of that $277,500 investment was given by the trust company to the parties entitled thereto. Whether the trust company should now be surcharged therefor is the question in difference.

When that investment was made, Harvey D. Gibson was a member of the before-mentioned syndicate, an officer of Kellenworth Corporation and of its golf club and was president of the trust company, — facts that were known at all times to all parties to this litigation. Reference was made above to a distribution of the $300,000 Kellenworth mortgage among the syndicate members. The amount thereby assigned to Mr. Gibson was $66,600. Though Mr. Gibson was still the record holder of that interest at the time of the above-stated transaction of September 28, 1928, the beneficial ownership thereof was then in Mr. Gibson's wife, for whom an equivalent interest in the

$375,000 consolidated mortgage was at once set apart. Mr. Gibson retired from the presidency of the trust company in June, 1929: he was thereafter chairman of its executive committee until January 5, 1931; and at the same time was one of the trustees of the trust company — a post he retained until December 29, 1933.

Mr. Lewisohn, the incompetent, died on July 31, 1938. In the course of the settlement of his affairs, counsel representing his executrix (his former wife) discussed with a then executive official of the trust company the different aspects of Mr. Gibson's nearness to the transaction whereby $277,500 of the $375,000 consolidated mortgage had been allocated by the trust company to itself as committee for Mr. Lewisohn. Nothing came of that conference, however, except an announcement by the trust company's officer of the unreadiness of his principal to rehandle the investment. In that state of affairs, the final account of the trust company as committee of Mr. Lewisohn was judicially settled on August 23, 1939, with the consent of his executrix, whereupon she and his son — as beneficiaries of his estate — became owners in equal parts of the $277,500 participation in the $375,000 mortgage.

Nearly three years later — on April 29, 1941 — Mr. Gibson (who at that time was no longer an officer of the trust company) sought on behalf of the golf club a reduction by the mortgagees of the rate of the interest payable on the same $375,000 consolidated mortgage. The golf club, Mr. Gibson then said, was likely " to fold up " and leave the holders of that mortgage in possession of a large piece of real estate with two small buildings on it. In their turn, financial advisers of Mr. Lewisohn's former wife and of his son suggested that the property " could be split up in building lots "; but Mr. Gibson in reply said the property " could not be split up into small lots " because " very hard restrictions were placed upon it." The upshot of that disclosure was an order vacating the settlement of the final account of the trust company as committee of Mr. Lewisohn and permitting the filing by his former wife and by his son of the objections that are now before us.

Thus there was brought to the fore a number of restrictions which had been imposed upon the mortgaged property by the syndicate members. These restraints forbade: (1) Any use of the property except as a residential estate or a golf course. (2) Sale of the property or any part of it to any person other than a syndicate member unless and until all syndicate members declined to exercise a continuing option which entitled them or any of them to the right of first purchase. (3) Any future subdivision of the property without the consent of the syndicate members. (4) The erection on the property of any building or the planting thereon of any tree within or adjacent to " vista lines " — i.e., lines that marked off space across which a view of Long Island Sound was to be had from the adjoining homes of the syndicate members. Each of these prohibitions was to run with the land until 1971.

As we come now to the respective contentions of the parties, one or two simplifications are in order. Mr. Lewisohn's former wife and his son — the objectors to the trust company's account as committee — are the appellants. We shall speak of them as the trust beneficiaries and of the trust company as the trustee. The transaction in issue is the purchase by the trust company as committee of Mr. Lewisohn of the $277,500 participation in the $375,000 consolidated mortgage. We shall refer to that transaction as the present mortgage investment.

The objections of the trust beneficiaries raise these points: (1) The present mortgage investment was illegal because it was not secured by " unencumbered real property " as required by section 21 of the Personal Property Law. (2) Apart from that section, the present mortgage investment was improvident as matter of law. (3) The present mortgage investment was a breach by the trustee of the duty of undivided loyalty that it owed as committee to Mr. Lewisohn as its ward and to the trust beneficiaries as his successors in interest.

The restrictions upon the mortgaged property are the storm center of the controversy. Counsel for the trustee say: " In considering this case, the restrictions should of course be looked upon with the eyes of 1923–1928, not of 1945." This expression

seems to us to fall short of the fundamentals of the situation in issue. Other things being in order, a proposed investment of trust funds in mortgage securities should always be judged with an eye on the fact that in the event of foreclosure the invested capital is often to be recaptured through a sale of the pledged land or not at all. This precept was as sound in 1923–1928 as it is in 1945, and consequently we do not feel at liberty to look at the contest from any different standpoint.

As to the prohibition against buildings or trees within or adjacent to the so-called vista lines, the trustee says that the land thereby kept vacant was '' low, marshy, filled-in land '' which was '' unsuitable for building or other similar use.'' But property of such little utility would not seem to be an appropriate security for an investment of trust funds. Moreover, the fixed emptiness of such a stretch of view must have been a detriment to the mortgaged property as a whole.

As to the prohibition against subdivision of the acreage, the trustee says: '' In 1928 large estates were not unwieldy liabilities.'' But the sale in this instance was to be one on foreclosure after default of the mortgagor. The main part of the mortgaged property consisted of three lots — one of 77 acres, · another of 58 acres and a third of 41 acres. Hence a foreclosure sale of 176 of the 182 mortgaged acres was to be dependent upon the discovery of a buyer or buyers for three large sections of a former golf course, none of which could be subdivided as matter of right.

As to the pre-emptive option enjoyed by the adjoining syndicate owners, the trustee says: '' It might of course delay a sale somewhat, but it does not go to the value.'' But the sale so mentioned was (we say again) to be a foreclosure sale. Bidders would hardly be attracted to a sale of that kind by the prospect that any offer would have to be maintained while the property was being reoffered successively to the four neighboring syndicate members, any one of whom through exercise of his option could upset a prior conditional sale on foreclosure.

As to the prohibition against use of the mortgaged property except as a residential estate or golf course, the trustee says

that "restrictions against other than residential use of this property are not to be held unusual or unreasonable at least when judged by the standards of the time." But at this point again, the argument for the trustee loses sight of the fact that incapacity to sell the property in lots of readily marketable size was to be a disadvantage to foreclosing mortgagees just as surely as the right to insist upon that disability was at all times to be a benefit to the syndicate owners of the dominant adjoining properties.

Such was the restricted state of the mortgaged property when the $375,000 consolidated mortgage thereon was acquired by the trustee in 1928 for the purposes of its fiduciary commitments. As it happened, the formal decision to take that mortgage for that purpose was left to Mortimer N. Buckner, who was then chairman of the board of the trustee and head of its trust committee. Nevertheless Mr. Gibson straightly says: "Naturally, I could not sit in the New York Trust Company right opposite Mr. Buckner and not have had some conversation with him about this mortgage in which everybody was interested, because we were all interested in the club; we were all members of the club * * *. I undoubtedly discussed it, yes. * * * I knew the mortgage was being made." In that way, Mr. Gibson, as president of the trustee, had his part in the process whereby his principal became possessed of the $375,000 consolidated mortgage for the uses of its trust committee. Nobody asserts any default of Mr. Gibson in the performance of what then and there was his undoubted official duty to state the facts in respect of the restrictions which he and his syndicate associates had laid upon the mortgaged property. Indeed the inference to the contrary is one of law. (See *Constant et al.* v. *University of Rochester*, 111 N. Y. 604; *Slattery* v. *Schwannecke et al.*, 118 N. Y. 543, 547–548; *New York Assets Realization Co.* v. *Pforzheimer*, 158 App. Div. 700, 702–703; 2 Mechem on Agency [2d ed.], §§ 1806, 1808.) Moreover, the text of the same restrictions had theretofore been recorded as part of the deed which the syndicate had delivered to Kellenworth Corporation; so that for one reason or another, the trustee must be taken to

have been aware of the existence of the syndicate restraints upon the mortgaged property prior to the date of the origination of the present mortgage investment.

Enough has now been said to show why that investment is denounced by the trust beneficiaries as a breach by the trustee of the duty of undivided loyalty which it owed to the interests that were committed to its care in its office as committee of Mr. Lewisohn. A true discharge of that duty called upon the trustee completely to avoid all occasions for the counteraction of incompatible demands. This stringent measure of trust administration is not one of mere inward integrity or unselfishness. The rule is inflexible that a trustee shall not place himself in a position where his interest is or may be in conflict with his duty (*Ten Eyck* v. *Craig et al.*, 62 N. Y. 406, 419; *Albright* v. *Jefferson County Nat. Bank*, 292 N. Y. 31).

That standard, we think, condemns the present mortgage investment. The interests of the trust beneficiaries required at least that the trustee should be free to negotiate for abatement or mitigation of the hard syndicate restrictions that burdened the mortgaged property. On the other hand, the interests of the trustee's president and his associates were to be served best by enforcement of the same restraints to their utmost limits. We do not see how the trustee was to stand between such divided allegiances without being subjected — in the persons of its managing officers — to the temptation to be false to its trust. The law permits no trustee to act in such inconsistent relations and this trustee should in consequence be surcharged (*Wendt* v. *Fischer*, 243 N. Y. 439; *City Bank Farmers Trust Co.* v. *Cannon*, 291 N. Y. 125; *Matter of Ryan*, 291 N. Y. 376).

At this point, we must go back for a moment to the final account of the trustee which was judicially settled on August 23, 1939, with the consent of Mr. Lewisohn's executrix. The trustee contends that the trust beneficiaries are now bound by the order of that date. This contention, as we see it, does not take adequate account of several things.

In the first place, the order of August 23, 1939, was vacated and the objections now before us were authorized by an order

made on May 19, 1942, which stands unreversed and unmodified. In the second place, the following finding in respect of the order of August 23, 1939, has been affirmed: "It cannot be said, on this record, that the objectants were aware of all the facts and were fully apprised of their legal rights". In the third place, there is the above-mentioned fact of the interchange that occurred on the death of Mr. Lewisohn between counsel for his executrix and the then executive officer of the trustee. The syndicate restrictions upon the mortgaged property having on that occasion been brought to the notice of that official for the first time, he made of his own motion an inquiry which was designed to show whether "there was anything that was sufficiently embarrassing to justify our taking some other action that I had already stated we were not willing to take, such as the repurchasing of the participation". From that episode, however, as has already been observed, Mr. Lewisohn's estate learned nothing as to the existence of any restriction against the mortgaged property.

In that connection, the same officer of the trustee said on the trial: "He [counsel for the executrix] didn't ask me what we had found. I didn't think it was necessary to report what we had found." On this item of testimony, the trustee invokes *Matter of Schoenewerg* (277 N. Y. 424). But the *Schoenewerg* case was one in which the condition of the there challenged investment was manifest upon the face of an accounting which the trustee had delivered to the objector. In our judgment, the present trustee's plea of estoppel was rightly overruled.

Since the restrictions against the mortgaged property were matters of public record, the trustee suggests that the trust beneficiaries should be charged with constructive discovery thereof through the rule as to notice under the recording acts. (See *Tarbell* v. *West et al.*, 86 N. Y. 280.) We reject this contention, because the trust beneficiaries (unlike the trustee) had no duty to search the title of the mortgaged property.

As to whether that property was unencumbered in a legal sense or whether the present mortgage investment was undeniably improvident we express no opinion.

The orders should be reversed, with costs in all courts to the appellants, and the matter remitted to the Special Term for further proceedings not inconsistent with this opinion.

LEWIS, CONWAY, DESMOND, THACHER and DYE, JJ., concur; LEHMAN, Ch. J., deceased.

Orders reversed, etc.