470 A.2d 585

ESTATE OF Frances R. McCREDY, Deceased.

Appeal of VILLAGE IMPROVEMENT ASSOCIATION (Doylestown Hospital) and Attorney General of the Commonwealth of Pennsylvania.

Superior Court of Pennsylvania.

Argued Feb. 10, 1983.

Filed Dec. 23, 1983.

Walter E. Nelson, Jr., Philadelphia, for Village Improvement, appellant.

Lawrence Barth, Deputy Attorney General, Philadelphia, for Commonwealth, appellant.

274

Davil L. Grove, Philadelphia, for Weaver, Campbell and Spellessy, participating parties.

Norman H. Brown, Philadelphia, for Provident Nat'l. Bank, participating party.

Before CAVANAUGH, BROSKY and CIRILLO, JJ.

CIRILLO, Judge:

The charitable beneficiary under a testamentary trust seeks to surcharge the corporate trustee and the individual trustee's estate for the amount of losses incurred on certain trust investments. The questions raised require an interpretation of provisions of the will of Frances R. McCredy, deceased.

Frances R. McCredy died on December 26, 1964. She left a will dated June 24, 1954, with codicils dated June 5, 1961 and November 25, 1964. Item Five of the will, as amended by the first codicil, left her entire residuary estate for the creation of a perpetual charitable trust, subject to certain life interests not relevant to this case. The will provided that trust income was to be paid in semi-annual installments forever to the Village Improvement Association, a tax-exempt women's club, for the operation and maintenance of the Doylestown Emergency Hospital.

Item Six of Mrs. McCredy's will reads:

In the management and control of my Trust Estate, I order and direct as follows:

(a) So long as he shall live and shall desire to be so employed, I order and direct that Arthur E. Spellissy shall have complete and absolute control and oversight of the management of said Trust, and during that time that the Corporate Trustee hereinafter named shall follow his directions blindly and implicitly, doing only the clerical work involved, keeping the records, etc. and having the physical care and custody and possession of the papers, documents, securities and muniments and evidences of title of the property and assets of said Trust. Under no circumstances shall he or his Executor or Administrator

be liable to any person at any time or in any proceeding whatever for anything whatever which he may do or direct to be done in reference to said Trust, nor likewise shall said corporate Trustee be liable, provided only that it obey his directions so long as he shall act as Investment Counsel for said Trust. For his services as Investment Counsel I direct that he shall be paid his regular current compensation for such oversight and advice, in addition to whatever sum may be paid him for his services as co-executor and co-trustee.

(b) In the management and control of the property and assets of said Trust, I order and direct that the Executors and Trustees and their successors as fiduciaries shall have such rights, powers and privileges as follow herein: My Executors and Trustees may retain any investment, asset or property which I shall have at my death so long as deemed wise and advantageous. They may also, in any manner they deem wise, sell and dispose of any trust asset or property ... at any time if deemed wise and advantageous.... They may invest trust funds in any type or kind of property or investment whatever, real or personal, including shares of common or preferred corporate stocks, and corporate bonds, and in "common trust funds", though same be managed by the corporate trustee.... They shall not be confined to income-producing property, nor such as is a legal investment for trust funds.... And they and their successor may exercise all or any one of the foregoing powers without any liability whatever to any beneficiary or any other person for any loss or depreciation in value of any trust asset, always provided that said corporate Trustee shall do therewith as directed by said Spellissy, so long as he shall act as Investment Counsel for said Trust.

In Item Eight of the will, Mrs. McCredy appointed "my friend and Investment Counsel ARTHUR E. SPELLISSY" and the Provident Trust Company of Philadelphia, to exercise the foregoing powers as both co-executors of her estate and co-trustees of the trust. Item Eight also provided that

should Spellissy cease to act as executor or trustee, he could continue to act as investment counsel to the trust so long as he desired.

After termination of the life interests previously mentioned, Spellissy and Provident Trust Company (now Provident National Bank) filed their final account as executors. By an adjudication dated June 30, 1969, the Philadelphia Court of Common Pleas, Orphans' Court Division, awarded the remaining estate to Spellissy and Provident as trustees. They continued as co-trustees of the trust, with Spellissy making all investment decisions for the trust and with Provident restricting itself to clerical duties, until Spellissy died on May 31, 1974. Because of Spellissy's death, Provident as surviving trustee filed an account covering the period from the inception of the trust to May 27, 1976. The executors of Spellissy's estate joined in the account insofar as it relates to Spellissy's period of stewardship.

The value of the trust principal had declined dramatically during the account period,[1] and the Village Improvement Association (hereinafter "VIA"), together with the Attorney General as parens patriae for charities, filed objections to the account. The objectants sought to surcharge the trustees on the basis of their investments in the securities of three corporations: Photon, Inc., Phoenix Steel Corporation, and Chrysler Corporation. The objectants alleged that the trustees breached two duties in making and retaining these investments: the duty of prudent fiduciary investment, and the duty of undivided loyalty to the trust. Judge Theodore S. Gutowicz of the Philadelphia Orphans' Court heard eight days of testimony and the parties' oral arguments. On August 10, 1981, Judge Gutowicz dismissed the objections to the account in a comprehensive opinion and adjudication. The judge ruled that Mrs. McCredy had established Arthur Spellissy's personal investment philosophy, rather than the rule of prudent investment, as the standard by which trust

---

1. The executors' final account, filed March 31, 1969, reflected principal with a market value of over $4,000,000. The trustees' account reflects trust principal with a market value of approximately $2,000,-000 less.

investments were to be measured. The judge also ruled that the trustees had not breached their duty of undivided loyalty, and that with respect to Photon securities Mrs. McCredy had waived the rule of undivided loyalty by bequeathing Photon securities to the trust with full knowledge that Spellissy was personally involved in the company. The VIA and the Attorney General filed exceptions to the adjudication, and the orphans' court sitting en banc dismissed the exceptions in a final decree dated December 18, 1981. The exceptants appeal, pursuing the same arguments they made in the orphans' court.[2]

We will affirm the Orphans' Court of Philadelphia.

## I. *Facts*

Mrs. McCredy's relationship to Arthur Spellissy dated back to May 1935. Mrs. McCredy, herself the widow of an investment adviser, in that month engaged Spellissy as her investment adviser and provided him with $240,780 to invest for her. Later she gave him $17,000 to invest. From that time on, every increase in Mrs. McCredy's invested capital came from securities as to which Spellissy rendered investment advice. By 1954, the year she executed her will, the market value of her securities had reached $1,009,003; by 1961, the year she executed her first codicil, her securities were worth $1,726,218; when she died at the age of ninety-six, her securities had a market value of over $2,750,000.

Mrs. McCredy took an active interest in her investments. She visited the offices of Spellissy's investment advisory firm more frequently than any other client, and discussed each investment with Spellissy before it was made. She received annual reports detailing her investments, plus all correspondence sent to shareholders by companies in which she had investments. In November of 1960, with age curtailing her mobility, Mrs. McCredy opened a custodian account at Provident National Bank for the keeping of her securities. She continued to receive annual investment

---

**2.** The Attorney General has not filed a brief in this Court, but joins in appellant VIA's argument.

reports directly from Spellissy, but shareholder correspondence thereafter went to Provident.

Spellissy was wed to his work as an investment adviser. He had founded his own firm in 1931; the firm, Spellissy & Associates, was registered as an investment adviser under federal and state law, and was incorporated in 1966. The firm was not registered under law as a broker-dealer of securities. Spellissy and his firm enjoyed an excellent reputation in the Philadelphia financial community. Spellissy had a unique investment philosophy. He believed that appreciation of principal was the best way to protect the value of a portfolio's securities; consequently he would sacrifice current income for future principal appreciation. Spellissy recommended to his clients that they carry certain "special situation" securities in their portfolios. According to Spellissy's investment philosophy, a "special situation" would have some feature making it a distinctively attractive hold; usually it was a modest-sized company undergoing some development that gave it special promise for the future. "Special situations" usually presented opportunities not followed or appreciated by the general investing public; they would not be considered standard investments, and a trust company like Provident usually would not see fit to invest in them for its accounts.

Of the three investments challenged by the VIA, at least two—Photon and Phoenix Steel—were decidedly "special situations" within Spellissy's investment philosophy.

*Photon, Inc.*

Photon, Inc., developed, manufactured, and sold high-speed phototypesetting equipment. High-speed phototypesetting represented the first basic innovation in typesetting since the introduction of hot lead typecasting in 1886. Spellissy considered Photon to be in the forefront of a new technology, and personally invested in Photon stock as early as 1951. Spellissy was very enthusiastic about Photon's future, and remained so until his death. He served on its board of directors from May of 1959 until February of 1974. He served as its treasurer, without salary, from August

1964 to August 1973. When he died on May 31, 1974, he held 503,400 shares of Photon common stock, approximately ten percent of the outstanding total. He was then the largest individual shareholder in the company.

Spellissy also recommended Photon securities to his clients and associates; specifically, Mrs. McCredy first purchased stock in Photon in July 1953, and she owned Photon securities continuously from that time until her death in December 1964. As part of her estate, she passed $15,000 Photon five percent convertible debentures due December 1, 1971, and 3,250 shares of Photon common stock. The total cost to Mrs. McCredy of these Photon securities had been $49,506; their fair market value at her death was $78,500.

In June of 1965, her executors exercised previously acquired rights to purchase 750 shares of Photon common stock for $9,000. On September 13, 1968, the executors received 12,000 additional shares of Photon common stock in a four-for-one stock split. By the time the executors filed their final account in March of 1969, the total market value of Photon securities held in the estate had reached $728,000.

On November 19, 1969, at Spellissy's direction, the trustees sold 500 shares of Photon stock at a gain of $10,303.85 in order to raise cash for the purchase of Phoenix Steel securities. On July 29, 1971, Spellissy directed an exchange of the Photon debentures for 12,000 additional shares of Photon stock, bringing total trust holdings in Photon to 27,500 shares of non-dividend-paying common stock. Had Spellissy not exercised the conversion privilege, Photon would have had no obligation but to pay the $15,000 par value of the debentures on December 1, 1971. At the time of the conversion, the fair market values for the trust's Photon securities were $112,000 for 15,500 shares of common stock and $84,000 for the debentures, for a total fair market value of $196,000 for all Photon securities. On July 28, 1975, Provident as surviving trustee withdrew all Photon securities from the trust account as worthless, under the following circumstances.

Photon "had speculative characteristics which perhaps could lead to the loss of the entire principal. It had no income. It had limited resources within the company. It was not a widely-followed reasonable quality investment." (Opinion of Gutowicz, J., 49, Finding of Fact 98, quoting testimony of James W. Stratton.) Photon's sales had been growing through 1968, but in 1969 the company stopped growing except in the inventory account. The inventory/sales ratio peaked at .86 in 1971. Such a high ratio

"suggests either that the company is building a lot of units which they are not selling and physically storing some of these or that there is something wrong with the accounting and that their cost of goods is being put on to the inventory account rather than expensing certain costs. It could be either of those two. The first would show up as a growing number of units in the inventory and the second would show up as the same number of units but with a growing cost of goods per unit assigned to the inventory."

(*Id.* at 50, Finding of Fact 101, quoting Stratton.) In March of 1973, Photon's board of directors learned that the company's past financial statements were of questionable accuracy. The board refused to issue annual financial statements for 1972, and terminated the company's auditors. The Securities and Exchange Commission suspended trading in Photon securities on March 26, 1973. The suspension was lifted on July 23, 1973, but SEC regulations still prohibited trading in Photon securities because of a lack of current financial information. A new auditor determined that the company's accounting procedures were unreliable and inadequate, and that the company's books materially overstated its sales and assets. The auditor made substantial adjustments to Photon's books, to reflect a deficit of $26,673,135 for the period December 31, 1971—September 30, 1973, instead of the previously reported retained · earnings of $1,239,820. Photon's officers and chairman of the board resigned and were replaced. Blame for the company's shoddy accounting fell on its former auditors and its former

president, Robert M. Campbell. Various suits were filed against Campbell and the auditors, and a group of stockholders won their suit for substantial damages. On February 14, 1975, Photon was declared bankrupt. As Photon's largest individual shareholder, Spellissy suffered a greater loss on Photon investments than anyone else.

*Phoenix Steel Corporation*

"Phoenix Steel is primarily a fabricator manufacturer of steel plate with its primary facility in Claymont, Delaware, and a tubing and pipe mill in Phoenixville. It is and has been for a long time a very marginal steel company, marginal because it is devoted to one product line and because its capital structure is overweighted with debt and relatively very little equity. To be more specific, if you look at the earnings per share line, you can see that Phoenix Steel in the ten years from 1968 through 1977 made money in only one year."

(*Id.* at 59, Finding of Fact 119, quoting Stratton.) Although Mr. Stratton had a poor opinion of Phoenix Steel as an investment, Arthur Spellissy believed in its long-term profitability. He personally invested over $200,000 in Phoenix Steel six percent convertible debentures due September 1, 1987. During the years 1967 through 1970, Spellissy also directed several purchases of the debentures on behalf of the McCredy estate and trust. In all, the executors and trustees expended $56,407.50 for the debentures. After Spellissy's death, Provident's portfolio manager for the McCredy trust, Marshall Figgatt, determined that the debentures were the least desirable of all securities held by the trust. He directed their sale in six lots between June 28 and December 11, 1974, at an aggregate price of $40,264.

In November 1969, Phoenix Steel offered a stock issue of 900,000 "units," each unit consisting of two shares of Phoenix common stock and one warrant to purchase an additional share. The price per unit was $11; at that time Phoenix Steel common stock was trading at $7.625 per share. Spellissy reviewed Phoenix's prospectus for the stock issue, which contained the following caveat:

[T]his offering involves special risks. The Company's Claymont, Delaware, plant has not been profitable since its purchase in 1960, and the profits from the Company's Phoenixville plant have decreased in each of the last 2 years. In 1966 the Company began a major modernization program at Claymont. This program took longer than was anticipated to complete and was not finished in its entirety until late 1968. Due in part to operational and mechanical difficulties, the new equipment is still producing at levels far below capacity and the Claymont plant continues to be unprofitable. As a result, the cash position of the Company has been critical for months. Accounts payable are in many cases long overdue, and the Company is experiencing difficulty in obtaining necessary materials and supplies and in attracting and retaining customers. Although the issuance of the securities offered hereby will at least temporarily alleviate its cash problem, there can be no assurance that it will do so permanently or that, when and if production approaches capacity, the Company will be able to sell sufficient products at prices which will result in net profits. In fact, losses are expected to continue for an unascertainable period of time.

Spellissy also visited Phoenix's plant to assess its modernization program. On behalf of various clients, Spellissy & Associates subscribed for 60,000 of the Phoenix Steel units. The firm put up the entire $660,000 purchase price out of its own funds and billed each client for his respective share. Spellissy directed the purchase of 1,000 units of the issue for the McCredy trust; at Spellissy's request Provident as co-trustee paid the $11,000 purchase price directly to Spellissy & Associates. Neither Spellissy nor his firm charged or received any compensation in connection with the transaction; in fact, the firm absorbed the interest costs on a loan of $400,000 it had obtained from Provident in order to purchase the units. On November 24, 1970, the trustees at Spellissy's direction sold the shares and warrants compris-

ing the Phoenix Steel units at a loss on principal of $4,661.37.

*Chrysler Corporation*

Mr. Spellissy for years had been knowledgeable about Chrysler Corporation, and interested in it as an investment. He recommended Chrysler stock to his clients and invested in it both personally and on behalf of various trusts for which he acted as investment adviser. Mrs. McCredy owned Chrysler stock continuously from 1957 to her death, at which she left 2,900 shares to her estate. Her executors bought an additional 100 shares, so that upon distribution of the estate the trustees received 3,000 shares of Chrysler common stock.

Chrysler is considered a "businessman's risk stock" in a cyclical industry. Chrysler suffered a short-term liquidity crisis in 1970. The company slashed its quarterly dividend from fifty cents to fifteen cents per share in February of that year. Spellissy was aware of the crisis, but believed in Chrysler's long-term prospects. The company's dividend never again reached its former level, but Chrysler rebounded from its difficulties, and earnings and dividends rose in 1971, 1972, and 1973. In January of 1973, Provident's trust department issued a "Progress Report" on Chrysler predicting a possible decline in sales for 1974, and essentially pointing out the volatile nature of Chrysler stock. In April 1974, news became available that Chrysler was suffering another liquidity crisis, a virtual "replay" of 1970. At the time of Spellissy's death on May 31, 1974, Chrysler stock was selling in the mid-teens, which translated into a paper loss on the McCredy trust's holdings of over $100,000. Although Spellissy sold 3,000 shares of his own Chrysler stock in the last two months of his life, he did not sell the McCredy trust's stock. After Spellissy's death, the price of Chrysler stock continued to decline through the year. On February 19, 1975, Chrysler's board of directors decided to suspend the company's quarterly dividend. Marshall Figgatt learned of the board's action and immediately ordered the sale of the McCredy trust's 3,000 shares. A sale was

consummated on February 26, 1975, resulting in a loss on the stock of $148,468.29, with $21,625 of the loss accumulating after Spellissy's death.

## II. *Standard of Review*

In assessing appellant's arguments, we must bear in mind general principles limiting our scope of review. The auditing judge's findings of fact were accepted by the orphans' court en banc, and we likewise must accept them if they are supported by the evidence. *Smith Estate,* 454 Pa. 534, 314 A.2d 21 (1974). Where the findings of fact are supported by evidence, our review is limited to rectifying errors of law. *Zeedick Will,* 421 Pa. 44, 218 A.2d 755 (1966). Of course, the inferences, deductions, and conclusions drawn by the orphans' court are not findings of fact and do not bind us on appeal. *Pruner Estate,* 400 Pa. 629, 162 A.2d 626 (1960).

## III. *Rule of Prudent Fiduciary Investment*

Appellants' first argument is that the trustees breached their trust by purchasing and retaining Photon, Phoenix, and Chrysler securities because these investments were imprudent and unauthorized investments for a charitable trust. The argument is based on the Pennsylvania rule of fiduciary investment care, codified in the Decedents, Estates, and Fiduciaries Code at 20 Pa.C.S. § 7302:

**Authorized investments; in general**

(a) **Specifically authorized.**—Subject only to the provisions of the governing instrument, if any, a fiduciary may accept, hold, invest in, and retain, any of the investments authorized by this chapter, and shall not be liable for loss on such investments so long as he exercises due care and prudence in the performance of his duties in regard to them. "Legal investment" or "authorized investment" or words of similar import used in a trust instrument shall be construed to mean any investment authorized by this chapter.

**(b) Prudent man rule.**—Any investment shall be an authorized investment if purchased or retained in the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital. . . .

*Cf.* Uniform Probate Code § 7–302:

Except as otherwise provided by the terms of the trust, the trustee shall observe the standards in dealing with the trust assets that would be observed by a prudent man dealing with the property of another, and if the trustee has special skills or is named trustee on·the basis of representations of special skills or expertise, he is under a duty to use those skills.

By case law, Pennsylvania follows the Uniform Probate Code in imposing a heightened duty of care on trustees possessing special expertise. *Estate of Stetson,* 463 Pa. 64, 345 A.2d 679 (1975). Not only the trustee's acquisition but also his retention of investments is subject to duties imposed for the benefit of the trust. *Id.*

The orphans' court did not decide whether Photon, Phoenix, and Chrysler were prudent or authorized investments under general Pennsylvania fiduciary law. Instead, the court relied on the language of the statute making its rule "[s]ubject ... to the provisions of the governing instrument," and held that the McCredy will allowed Spellissy wide discretion to invest according to his own "investment philosophy" without limiting him to prudent or authorized investments. The court found that Spellissy's purchase or retention of each of the questioned investments was done in "conscious implementation of his personal investment philosophy," thus satisfying the standard set down by the testator.

By the terms of the trust, the testator may permit the trustee to invest in or retain securities which are not

proper investments under the prudent man rule, Restatement (Second) of Trusts, § 227, Comment u (1959) (hereinafter "Restatement"), or which are not statutorily authorized investments for trustees. *Henry Estate*, 413 Pa. 478, 198 A.2d 585 (1964). When the terms of a trust instrument prescribing a trustee's investment powers conflict with the Fiduciaries Code, the trust instrument controls. 20 Pa.C.S. § 7319(a). *See In re Estate of Niessen*, 489 Pa. 135, 413 A.2d 1050 (1980). The intent of the testator, as gathered from the language of the will, the scheme of distribution, and the facts and circumstances surrounding the testator when he made his will, remains the "polestar" fixed for the court's guidance in interpreting the terms of a will. *Gramm Estate*, 437 Pa. 381, 263 A.2d 445 (1970).

■ Mrs. McCredy's will appoints Arthur Spellissy, her long-time friend, as both investment counsel and decision-making trustee for the charitable trust. Item Six directs that Spellissy should have "complete and absolute control and oversight of the management" of the trust, while directing the corporate trustee to follow Spellissy "blindly and implicitly," and to restrict itself to clerical duties. The will empowers the executors and trustees and their successors to "retain any investment ... I shall have at my death so long as deemed wise and advantageous," and to "invest trust funds in any type or kind of property or investment whatever.... They shall not be confined to income-producing property, nor such as is a legal investment for trust funds." These terms evidence an intent not to restrict the trustees to investments authorized by statute, but to remove the trustees' investment decisions from the ambit of the statute.[3]

Still, appellants argue that by permitting the trustees to retain or invest trust property only "so long as deemed wise

3. When Mrs. McCredy executed her will and codicils, Pennsylvania statute law employed a "list" scheme of authorized types of investments. However, fiduciaries were held to the prudent man standard with regard to the types of securities listed in the statute. The statute also provided that the testator's directions were to control when they conflicted with the statute. Act of May 26, 1949, P.L.1828, No. 544.

or advantageous," Mrs. McCredy intended that trust investment decisions should be measured by an objective standard of prudence. The orphans' court took the view that this language merely served to confirm that Spellissy's personal investment philosophy was to be the sole yardstick of investment care.

We believe the court's determination is amply supported by the evidence. Spellissy made his unusual investment philosophy well known in the investment community. Mrs. McCredy had a close working relationship with Spellissy for over thirty years. During that time Spellissy, by using his special investment philosophy, helped her to vastly increase her investment holdings. According to officers of Provident assigned to the McCredy trust, they found the language in the will giving Spellissy absolute control over trust investment decisions to be quite unusual and explicit, and during Spellissy's lifetime they honored the letter of the will by taking no active part in trust investments. The VIA also virtually ignored the performance of the trust portfolio, on counsel's advice that it had no right to question Spellissy's decisions. Had Provident's trust officers had control over the McCredy trust's portfolio, they would have deemed the Photon, Phoenix, and Chrysler holdings too speculative for a charitable trust and would have liquidated the holdings. Taken as a whole, the evidence tends to indicate that Mrs. McCredy apportioned the trustees' duties with the specific intent of allowing Spellissy to implement his investment philosophy for the trust, and with the knowledge that a trust company would pursue a much more conservative investment pattern than Spellissy would.

■ The court's construction of the McCredy will does not leave Spellissy's administration of the trust subject to no standard at all, as appellants allege. By choosing Spellissy as trustee and investment adviser for her trust, Mrs. McCredy was adopting a standard of care she knew he would implement for the trust: his special investment philosophy. Had Spellissy, through neglect or carelessness, invested or retained investments in securities willy-nilly or

without thinking about his reasons for doing so, he would not have met the standard prescribed by the testator. But the evidence shows that the questioned securities were consciously sought out. Not only did Spellissy's associates testify that the three companies fit into his scheme of investment; it was also clear that Spellissy invested in the companies for numerous other clients and himself.

Appellants allege generally that Spellissy disregarded the interests of the charitable beneficiary, but the major premise for their allegation appears to be that Photon, Phoenix Steel, and Chrysler securities were poor quality investments for Spellissy to make and retain. It is essentially irrelevant whether we agree that they were poor quality investments, for under the terms of the trust that determination was left to Spellissy, not us.

The only specific evidence cited by appellants from which to infer that Spellissy temporarily abandoned his trust is the evidence of his sales of Chrysler stock for his own account in the last two months of his life. News of Chrysler's liquidity crisis had just come out in April 1974, and Spellissy sold 3,000 of his personal shares in a declining market in April and May, while taking no action with the trust's 3,000 shares. The auditing judge found generally that Spellissy was not motivated to make any sale of his own Chrysler stock by concern over the company's financial condition. With specific regard to the April and May sales, we are not certain what evidence the judge relied on for his finding. We do know that in late 1973 and early 1974, Spellissy personally bought 13,000 shares of Chrysler stock in eighteen separate transactions. During this period the market price for Chrysler stock fluctuated between the high twenties and the mid-teens. Spellissy last purchased Chrysler stock on March 14, 1974, at twenty dollars per share; thereafter he sold 1,000 shares on April 19 at 17½; 1,000 shares on May 1 at 17⅛; and 1,000 shares on May 23 at 17. Spellissy appears to have been actively speculating in Chrysler stock for his personal account, and to have sold

3,000 shares because he foresaw the downturn in the market.

However, Spellissy's personal investment philosophy emphasized holding securities in anticipation of long-term gains and income enhancement. It is reasonable to conclude that Spellissy was holding onto the trust's Chrysler stock in an attempt to realize these long-term goals for the trust. The Chrysler shares held in the trust had been purchased at times when Chrysler was still trading in the forties; had Spellissy liquidated the stock at the time he was selling his own, the trust would have realized a loss approximating $100,000. Giving due respect to Judge Gutowicz's findings, we draw no inference of improper purpose or negligence from Spellissy's actions in the months before his death.

We hold that it was not a breach of trust for Spellissy to follow his own investment scheme on behalf of the trust.

After Spellissy's death on May 31, 1974, Provident as surviving trustee retained the trust's 3,000 shares of Chrysler stock until February 1975. In their only nonderivative claim against the corporate trustee, appellants seek to surcharge Provident for the loss suffered on the Chrysler stock between May and February. Appellants argue that Provident should have liquidated the stock in June or July, and that its failure to do so resulted from inattentiveness. In assessing this argument, the auditing judge held Provident to the heightened duty of care applicable to a corporate trustee with a highly developed trust department. *See In re Mendenhall,* 484 Pa. 77, 398 A.2d 951 (1979). By this standard, the court found that Provident had fulfilled its duty as trustee. Because the court's determination is supported by evidence, we will not disturb it.

At Spellissy's death, Marshall Figgatt, an experienced investment banker, took over active administration of the trust. Figgatt reviewed the trust portfolio in June or July of 1974 and decided immediately to sell the Chrysler stock at the earliest opportunity. However, Figgatt held

off selling the stock in the expectation that its market price, which then was very depressed, would rise closer to what he believed to be the true value of the stock. Figgatt also factored into the equation the dividend paid on Chrysler stock and the income needs of the hospital as beneficiary. Appellants' expert witness, James Stratton, agreed at trial that Figgatt's decision to wait was reasonable under the circumstances. But in spite of Figgatt's considered judgment, the price of Chrysler stock continued to decline through 1974, reaching a low in December. By February 19, 1975, the price of the stock still had not recovered to a level acceptable to Figgatt, but on that day he received information that Chrysler's board of directors had suspended the dividend. Figgatt coupled this information with rumors beginning to surface that Chrysler was having difficulty rolling over its commercial paper, and decided that he could no longer afford to wait for the market price to recover. That same day Figgatt ordered a sale of the trust's Chrysler stock. The loss to the trust was unfortunate, but the evidence supports the auditing judge's conclusion that Provident acted on a sound basis in retaining the stock as long as it did. Provident's foresight may not measure up to appellants' hindsight, but hindsight is not the test of a trustee's diligence. *Estate of Knipp*, 489 Pa. 509, 414 A.2d 1007 (1980); *Lerch Estate*, 399 Pa. 59, 159 A.2d 506 (1960).

## IV. *Rule of Undivided Loyalty*

 Appellants argue that, regardless whether the trust instrument authorized Spellissy to pursue his unorthodox investment philosophy, his decisions to invest in and retain the questioned securities violated the rule of undivided loyalty: In general, "[t]he trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." Restatement, *supra*, § 170(1). The rule prohibits both self-dealing and conflicts of interest. Thus, the trustee must neither 1) deal with trust property for the benefit of himself or third parties, 39 P.L.E. *Trusts* § 186

(1961), nor 2) place himself in a position inconsistent with the interests of the trust. *Id.* § 185.

Appellants find an instance of self-dealing in Spellissy's purchase as trustee of the 1,000 units of Phoenix Steel directly from his firm, Spellissy & Associates. It is elemental to the rule against self-dealing that a trustee may not sell to himself, as trustee, property which he owns in his individual capacity. *Tracy v. Central Trust Company*, 327 Pa. 77, 192 A. 869 (1937); Restatement, *supra*, § 170, Comment h. The rule extends to purchases from a firm of which the trustee is a partner or member. *Curtis Trust*, 45 Pa.D. & C.2d 701 (Orphans' Ct.Phila.1968); Restatement, *supra*, § 170, Comment h; 2 Scott on Trusts § 170.12 (3d ed. 1967). However, where the trustee never actually holds an interest in the property sold to the trust, no self-dealing occurs. Scott, *supra*, § 170.14. The authorities specifically permit a corporate trustee to advance its own money for investment in mortgages and to distribute participations in the mortgages among various trusts administered by it, if the mortgages were acquired for the purpose of distribution among the trusts and only a short interval elapses between the purchase and the distribution. Restatement, *supra*, § 170, Comment i; Scott, *supra*, § 170.14. *See* 7 P.S. § 405; *Downing Estate*, 162 Pa.Super. 354, 57 A.2d 710, *aff'd per curiam*, 359 Pa. 534, 59 A.2d 903 (1948); *Curtis Trust, supra;* *Estate of Van Deusen*, 37 A.D.2d 131, 322 N.Y.S.2d 951 (1971). When a trustee purchases property for distribution to various trusts, he must "earmark" the property held for each trust. *Lewis Estate*, 349 Pa. 455, 37 A.2d 559 (1944). See Restatement, *supra*, § 179, Comment d.

In purchasing the Phoenix Steel units, Spellissy's firm acted simply as a conduit to facilitate purchases of the units by its various clients. The auditing judge found that the 60,000 units subscribed for by the firm all were issued in the names of the clients who eventually were to have them. Spellissy & Associates billed each client only for the purchase price of the units each received; instead of being

compensated for its role in the transaction, the firm itself absorbed interest costs on the loan it took out to make the purchase. The judge also found that Spellissy & Associates "earmarked" the 1,000 units purchased for the McCredy trust in accordance with a prearranged subscription plan. Appellants question the finding, pointing out that the original plan called for the McCredy trust to receive 2,000 units; this fact is adequately explained by Spellissy & Associates' inability to purchase as many units as it had intended, and is not a reason to upset the court's finding. We agree with the court's conclusion that the trustees' purchase of Phoenix Steel units directly from Spellissy & Associates involved no self-dealing on Spellissy's part. *Cf. Cornet v. Cornet*, 269 Mo. 298, 190 S.W. 333 (1916) (prohibited self-dealing for trustee to buy bonds with personal funds for distribution to trusts administered by him or to his personal account, depending on conditions of the various trusts).

As for the fact that Spellissy & Associates was not licensed to act as a broker-dealer of securities (and appellants have cited no authority to establish that this is what the firm was doing in this case), we are convinced that the fact is irrelevant under the circumstances. Our concern is to examine Spellissy's conduct for breaches of trust; having determined that the Phoenix Steel transaction was not self-dealing, we would serve no purpose by determining whether the firm's conduct might be questioned on grounds unrelated to the administration of the trust.

Appellants next find conflicts of interest in the fact that Spellissy had substantial personal interests in the companies whose securities he purchased or retained for the trust.[4]

**4.** Collaterally, appellants argue that Spellissy violated the federal Investment Advisers Act of 1940, § 206 (as amended), 15 U.S.C. § 80b–6, by advising the trust on its Photon, Phoenix Steel, and Chrysler securities without revealing to the VIA his personal interests in those companies. The orphans' court refused to consider any claim based on federal law, holding that Spellissy's administration of the trust was to be judged exclusively under Pennsylvania law. We understand that appellants are arguing that a violation of federal securities law should constitute a breach of trust under Pennsylvania law. However, nei-

The trustee violates his duty to the beneficiary if he sells to himself as trustee his individual property or property in which he has a personal interest of such a substantial nature that it might affect his judgment. It is immaterial that the trustee acts in good faith in purchasing the property for the trust, and that he pays a fair consideration. This is true whether he purchases for the trust property which he owns individually, or property owned by a firm of which he is a member, or property owned by a corporation in which he has a controlling or substantial interest.

. . . .

A trustee cannot properly purchase securities for the trust for the purpose of maintaining the market price of similar securities in which the trustee has an individual interest, even though he purchases the securities in the market from third persons.

Restatement, *supra*, § 170, Comment h.

The test of forbidden self-dealing is whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it *might* have affected his judgment in material connection: *Downing Estate*, supra [162 Pa.Super.], at p. 359 [57 A.2d 710], citing Scott on Trusts, § 170(1) Comment h.... It will be noted that the extent of the fiduciary's disqualifying interest need not be such as "did affect his judgment" but merely such as "might affect his judgment": *Downing Estate*, supra, 162 Pa.Superior Ct. at p. 360 [57 A.2d 710].

*Noonan Estate*, 361 Pa. 26, 31, 63 A.2d 80, 83 (1949).

■■■ A potential conflict of interest arises when a trustee purchases for the trust the stock or securities of a corpora-

ther the federal act nor the case law and regulations interpreting the act specifically condemns the type of conduct engaged in by Spellissy. The act prohibits an investment adviser from perpetrating any "fraud or deceit" upon a client. Essentially, appellants beg the question by urging us to extend the prohibition of the act to the facts of this case; of course a "fraud or deceit" would amount to a breach of trust under Pennsylvania law, but we are better able to identify a fraud or deceit by interpreting trust law rather than by attempting to extend federal securities law.

tion in which he has substantial personal interests. As Professor Scott says in treating the related case of a corporate trustee holding its own stock in trust,

> It is quite true that under ordinary circumstances there is in fact no actual conflict of interest; but there is a possibility that circumstances may arise in which there is a conflict of interest. The rule of undivided loyalty is based on this possible conflict. The trustee and its officers and directors are in a position where in determining whether to sell or retain in the trust the stock of the trustee they cannot approach the problem with the same detachment with which they could approach the problem of selling other securities.

Scott, *supra*, § 170.15, at 1340. However, in the case of an individual trustee, there is an inherent problem in saying when his personal interests in a corporation are substantial enough to cause a potential conflict of interest should he purchase or retain that corporation's stock for the trust. The Pennsylvania courts have not attempted to define a "substantial" interest in a corporation. *See, Comerford Estate*, 388 Pa. 278, 130 A.2d 458 (1957) (fiduciary may not purchase securities in a corporation in which he is "substantial" stockholder) (dictum). *Cf. Ryan v. Plath*, 18 Wash.2d 839, 140 P.2d 968 (1943) (prohibited self-dealing for trustee to sell trust property to corporation of which he was president, general manager, and majority stockholder; court found sale to corporation was in effect sale to trustee himself); *Re Filardo*, 221 Wis. 589, 267 N.W. 312 (1936) (court found self-dealing where guardian of incompetent invested trust funds in the frozen assets of a bank which was hard pressed to maintain its cash reserve and of which guardian was officer, director, and stockholder).

█ In the final analysis, whether a trustee's personal interests present an impermissible potential conflict with those of the trust is a determination to be made on the facts of each case. *See generally* 90 C.J.S. *Trusts* § 248 (1955). We should be guided in our analysis by the *Noonan* stan-

dard prohibiting personal interests that *might* affect the trustee's investment decisions on behalf of the trust.

■ As a matter of law, we hold that Spellissy's personal investments in Phoenix Steel debentures and Chrysler stock were not substantial enough in themselves to conflict with his proper administration of the trust. To hold otherwise would be to effectually outlaw a trustee's owning personal stock, even a relatively small amount, in a corporation in which the trust has stock. The holdings of both Spellissy and the trust in Chrysler stock were minute in comparison to the outstanding total. We find it inconceivable that Spellissy's decision to retain in the trust 3,000 shares of Chrysler stock, including 2,900 devolved from the settlor, could have been motivated or tinged by personal interest. Similarly, Spellissy's personal holdings in Phoenix Steel debentures, although not insignificant in dollar amount, should not be characterized in the words of the Restatement as a "controlling or substantial" interest in the firm. Restatement, *supra*, § 170, Comment h. Certainly neither the Chrysler nor the Phoenix Steel holdings of the trust could have been held for the purpose of maintaining the market prices of Spellissy's own securities. *Id.* In the circumstances of this case, it seems highly unlikely that Spellissy's purchases of Chrysler or Phoenix Steel securities for the trust or for his numerous other clients could have been influenced by the extent of his personal holdings in those companies.

Our holding assumes, of course, that Spellissy's decisions to purchase and retain these securities for the trust were not in fact made to further his personal interests, or in disregard of the trust's interests. On this point we must accept the orphans' court's findings that Spellissy acted in what he believed to be the interests of the trust.

Spellissy's personal interests in Photon were much more complex. During the period of the trust accounting, Spellissy was a treasurer, director, and ten percent stockholder of Photon. These relations alone show a high correlation of interest between Spellissy and the company, even though,

as treasurer, Spellissy did not run the company's financial operations or collect a salary. Additional undisputed facts are that Spellissy had followed Photon enthusiastically almost since its inception, proudly made known his personal involvement with the company, and remained confident about it even through adversity. Never in Spellissy's twenty-year association with Photon did his outward enthusiasm for it dampen, even after Photon's reported sales/inventory ratio began its decline in 1969, and apparently even after Photon's board of directors discovered major irregularities in the company's books for the early 1970s. Despite Spellissy's aspiration for and affinity with Photon, its stock never earned a cent of income for the McCredy trust's charitable beneficiary, and in fact the stock decreased in value continuously throughout the administration of the trust.

When a trustee invests his personal pride and good name, as well as his personal capital, in a corporation whose securities form a substantial part of the trust corpus, he places himself in a position where it is very difficult to remain inflexibly loyal to the trust. *Cowan v. Hamilton National Bank*, 177 Tenn. 94, 146 S.W.2d 359, *cert. denied*, 313 U.S. 592, 61 S.Ct. 1116, 85 L.Ed. 1546 (1941). At some point a trustee's personal ties to a company will compel the conclusion that investment of trust assets in the company is improper. When the point is reached, we do not stop to inquire whether self-interest actually tinged the trustee's decisions for the trust; the rule of undivided loyalty is not intended to be remedial of actual wrong, but preventive of the possibility of it. *Banes Estate*, 452 Pa. 388, 305 A.2d 723 (1973); *In re Pew Memorial Trust No. 1*, 5 Pa. D. & C.3d 627 (Orphans' Ct. Phila.1977). As the New York Court of Appeals said in *In re Lewisohn*, 294 N.Y. 596, 608, 63 N.E.2d 589, 592 (1945),

> A true discharge of that duty [of undivided loyalty] called upon the trustee completely to avoid all occasions for the counteraction of incompatible demands. This stringent measure of trust administration is not one of mere inward integrity or unselfishness. The rule is inflexible that a

trustee shall not place himself in a position where his interest is or may be in conflict with his duty.

The extent and gravity of Spellissy's personal interests in Photon were such that we cannot rule out that his judgment in handling the trust's Photon investments might have been affected. However, in refusing to surcharge the accountants for losses suffered on the trust's Photon holdings, the orphans' court held that Mrs. McCredy waived the rule of undivided loyalty. We believe the court properly so held.

Generally, by the terms of the trust the settlor can waive the application of the rule of undivided loyalty. Scott, *supra*, § 170.15; Restatement, *supra*, § 170, Comment t. The settlor can also waive the rule by implication, where he knowingly places his trustee in a position which might conflict with the interests of the trust or its beneficiaries, and gives the trustee power to act in that dual capacity. *Pincus Estate*, 378 Pa. 102, 105 A.2d 82 (1954); *Steele Estate*, 377 Pa. 250, 103 A.2d 409 (1954); *Flagg Estate*, 365 Pa. 82, 73 A.2d 411 (1950). *Cf. Burke Appeal*, 378 Pa. 616, 108 A.2d 58 (1954) (trustees permitted to deal parcels of trust land to themselves where one of trust purposes was to satisfy their claims out of trust estate); *Patterson v. Lennig*, 118 Pa. 571, 12 A. 679 (1888) (purpose of trust was to pay debts to creditors, including trustee); *In re Kellogg's Trust*, 35 Misc.2d 541, 230 N.Y.S.2d 836 (1962) (family trust holding stock of family corporation).

A comparable situation in which the Pennsylvania courts permit self-dealing arises when a settlor bequeaths stock in a corporation to the corporation as trustee, and authorizes the trustee generally to retain investments held by the settlor at death. *Glauser Estate*, 350 Pa. 192, 38 A.2d 64 (1944); *Child Estate*, 15 Pa.D. & C.2d 257 (Orphans' Ct.Phila.1957); *Clay's Estate*, 25 Pa.D. & C. 257 (Orphans' Ct.Phila.1936). *Accord, Matter of Heidenreich*, 85 Misc.2d 135, 378 N.Y.S.2d 982 (1976); *contra, In re Trusteeship of Stone*, 138 Ohio St. 293, 34 N.E.2d 755 (1941) (requiring an express authorization for trustee to retain its own stock).

In this case Mrs. McCredy did a closely analogous thing: she passed Photon stock and debentures as part of her estate and authorized Spellissy as executor and trustee to retain any investments she held at her death. The VIA argues evidence was sparse that Mrs. McCredy knew of Spellissy's Photon connections. However, the evidence supports the orphans' court's finding that she did know, and we are therefore bound to accept that finding. *Estate of McClatchy*, 492 Pa. 352, 424 A.2d 1227 (1981). Mrs. McCredy maintained a close relationship with Spellissy as friend and investment counsel, and discussed each investment with him in detail. He was very sanguine about Photon, and made his pride and stake in the company widely known. Spellissy's own connections to Photon must have been among the topics of discussion when he advised Mrs. McCredy to buy into the company. We can also assume that after investing in Photon she read its stockholder correspondence identifying Spellissy as a director of the company.

The will itself is additional strong evidence that Mrs. McCredy had no intention of preventing Spellissy from retaining and trading in Photon securities for the trust. She gave him paramount, unfettered discretion to make investment decisions, and in broad terms insulated him from liability for his decisions. Mrs. McCredy would have been at a loss to express more emphatically her intention that the final word on trust investments was to be Spellissy's. Where an instrument grants such broad power to the trustee we should not interfere with the trustee's exercise of that power absent bad faith or profiteering at the beneficiary's expense. *See* Restatement, *supra*, § 170, Comment t, § 222(2); Scott, *supra*, § 222; *compare Renz v. Beeman*, 589 F.2d 735 (2d Cir.1978) (trustees appropriated trust opportunities for their own account); *Vredenburgh v. Jones*, 349 A.2d 22 (Del.Ch.1975) (semble). The terms of Mrs. McCredy's will indicate her intent to vest complete authority in Spellissy, and that intent controls. *In re Estate of*

*Flagg,* 501 Pa. 38, 459 A.2d 740 (1983); *In re Estate of Macfarlane,* 313 Pa.Super. 397, 459 A.2d 1289 (1983).

We hold that Spellissy's estate is not subject to surcharge. Provident National Bank, which was directed by the McCredy will to follow Spellissy "blindly and implicitly," likewise can suffer no surcharge.

The decree of the orphans' court dismissing exceptions and confirming the trustees' account is affirmed.