In the Matter of the Accounting of WELLES V. MOOT, as Surviving Trustee under the Will of HOYT R. SHEHAN, Deceased, Respondent. WILLIAM J. TREPAGNIER, as Administrator C. T. A. of HENRY H. ROBERTS, Deceased, Appellant; MARY E. G. DAVIS et al., Respondents.

Fourth Department, May 18, 1955.

*Dana B. Hellings* for surviving trustee, respondent.

*George E. Brand, George E. Brand, Jr., Franklin R. Brown* and *Mark N. Turner* for appellant.

*Theodore G. Kenefick* for Mary E. G. Davis and another, respondents.

Van Duser, J. The will of the late Hoyt R. Shehan created two trusts, of which his uncle, one Roberts, was life income beneficiary. Roberts' administrator *c. t. a.* has filed objections to the account of the surviving trustee, and now appeals from an order of Surrogate's Court providing for the examination of the trustee. The question on this appeal concerns the permissible scope of the examination.

Shehan's will, correctly interpreted, placed his residuary estate in the following two trusts: (1) The income from one quarter was to be paid to Roberts for life, remainder to testator's wife if she survived Roberts (which she did not), otherwise the income should be paid to testator's sister-in-law for life, with remainder to her daughter. (2) The income from three quarters of the residuary estate was to be paid to the wife for the life of Roberts, remainder to the wife if she survived Roberts (and she did not), otherwise the income should be paid to Roberts for life, with one fourth of the remainder to testator's cousin. The remaining three fourths of the second trust fund was not specifically disposed of, but paragraph 4 of the will provided: "The balance of my estate, not otherwise disposed of, I give to my friend, Welles V. Moot". Mr. Moot and the wife were named executors and trustees. They were discharged as executors by a decree dated August 11, 1944. The wife died on February 28, 1947, and Mr. Moot has continued as surviving trustee. Upon her death, he acquired a vested interest in nine sixteenths of the residuary estate (three fourths of the second trust), and his petition for an accounting prays for (1) a decree judicially settling and allowing his accounts for the period from June 16, 1947, to July 5, 1950, and (2) a distribution of the principal of the second trust.

In his lifetime Hoyt R. Shehan was the owner of 19,656 of the outstanding 45,463 shares of common stock of Wildroot Co., Inc., a domestic corporation. Mr. Moot and his wife owned 1,000 shares. Mr. Moot appears in this case in several capacities. He is, and at all times relevant has been, a director and officer (secretary) of Wildroot Co., Inc., and of its subsidiaries. He is also attorney for those corporations. He is executor, trustee, and remainderman under the Shehan will. His law firm drew the wills of Hoyt and Mrs. Shehan, and is counsel to their executors and trustees. Mr. Moot himself was also a voting trustee of certain voting trusts holding control of Wildroot Co., Inc. He says that he approved of the Wildroot management "and wished to stabilize it and make it constant". A voting

trust was accordingly formed, embracing a majority of the voting shares of Wildroot, with Mr. Moot and the Shehans among the five voting trustees. That agreement was made in 1933. It included the Shehan stock. Mr. Shehan died in 1942. A second voting trust agreement was entered into shortly after his death. It included the same stock, and Mr. Moot and Mrs. Shehan transferred the 19,656 shares from the estate to five voting trustees, including Mr. Moot, his law partner, and Mrs. Shehan, who, it is claimed, has been largely dominated by Mr. Moot. The stock deposited under the voting trust was transferred on the corporate books into the names of the voting trustees. According to the objections, the agreement provided that the vote of a majority of the voting trustees present at any meeting should control, that the trustees were expected to (and did) vote for themselves as directors of Wildroot, and that the sole right remaining to the certificate holders (including Mr. Moot and Mrs. Shehan as executors and trustees) was to receive the dividends after deduction of the expenses of the voting trust.

Enough has been stated to indicate the important position held by Mr. Moot in the affairs of Wildroot, and the variety of interests which he has undertaken to represent. One objection to the settlement of his accounts as surviving trustee concerns the charge, by the life tenant's administrator *c. t. a.*, that Mr. Moot placed himself in inconsistent fiduciary positions. It is asserted he surrendered the estate stock to the voting trust; as voting trustee, he voted for his own election as director of Wildroot; and in the latter capacity he " voted, aided and assisted in withholding the declaration of dividends by said company and thereby enabled said corporation to accumulate from time to time a large and unnecessary surplus which should have been distributed to the stockholders "; as directors Mr. Moot and Mrs. Shehan " continued a policy of limited declaration of dividends and transfer of large portions of corporate earnings to surplus and the use thereof for permanent capital purposes, thereby greatly reducing the income to said Roberts, to the advantage and enrichment of said Mr. Moot as beneficiary of the remainder interest in said stock and estate ". The same policy is asserted to have been pursued by Mr. Moot as an officer and director of the subsidiary corporations. Mr. Moot resists an examination as to these matters, on the ground that they involve his conduct as a director of the corporation and not as trustee and executor.

Certain other objections complain of Mr. Moot's conduct as executor and trustee, and may be briefly summarized as follows:

(1) Mr. Moot and Mrs. Shehan sold to the latter, individually, the estate's right to purchase additional Wildroot stock; the agreed consideration, it is claimed, was grossly inadequate; Mrs. Shehan was the sole offeree; and the trustees made no attempt to secure a bona fide purchaser.

(2) Mr. Moot and Mrs. Shehan sold to one Schwartz (an officer of Wildroot) 200 shares of Wildroot stock owned by the estate; Mr. Moot as surviving trustee also sold to Schwartz an additional 100 shares owned by the estate; the consideration for these sales was below the fair market value, Schwartz was the sole offeree, and the trustees made no attempt to secure a bona fide purchaser.

(3) Mr. Moot as trustee sold 101 shares of the stock of a Wildroot subsidiary to officers of Wildroot Co., Inc.

(4) Mr. Moot and Mrs. Shehan as executors and trustees, sold a residence owned by the estate to Mr. Moot's law partner for a consideration far below the fair market value; the law partner immediately reconveyed to Mrs. Shehan, whom the transaction was intended to benefit; there was no other offeree.

(5) The objector's testator (Roberts) was an elderly man, who placed his confidence in his relative, one Hurlbert, a law partner of Mr. Moot. With Moot's knowledge and approval, Hurlbert played on Roberts' dislike of litigation to induce him to execute waivers and consents to decrees settling Moot's 1942–1949 accounts and interpreting the first trust. Without any consideration or independent legal advice, Roberts executed the releases as the result of misrepresentation and nondisclosure of material facts, of which Mr. Moot and Mr. Hurlbert knew he was ignorant. One of the decrees, to which Roberts' consent was thus procured, so misinterpreted the first trust as to convert his life estate in the income thereof into an estate for the life of Mrs. Shehan.

(6) Mr. Moot failed to pay to Roberts the income from the first trust after the death of Mrs. Shehan.

Thus the objections, concerning which an examination of Moot is sought, are largely of two kinds. One complaint is that Mr. Moot as trustee wasted trust assets. The other is that, in various and inconsistent capacities, he was guilty of self-dealing and breach of his fiduciary obligations, so that he was personally enriched at the expense of the life tenant. The chief question on this appeal is whether Mr. Moot must submit to

inquiry into his activities as an officer and director. The order appealed from provides, in the language of section 263 of the Surrogate's Court Act that Mr. Moot " as surviving trustee " be examined " as to all matters relating to the administration of the fund ", and that " he produce at said time all books, papers, records and documents as relate to his administration of the fund ". The objector regards this order as precluding an inquiry into Mr. Moot's conduct as an officer and director of Wildroot, and accordingly appeals.

In opposition to his examination Mr. Moot submitted a lengthy affidavit, in which he relied on prior decrees settling his accounts, and attempted to explain the specific charges against him. He resisted an examination as to any matter occurring prior to December 31, 1949, on the ground that his accounts prior to that time had been judicially settled and approved, and that in each instance Roberts, after receiving a copy of the account, executed a release or waiver. Those accounts are not in the record. Neither are the decrees. A decree is *res judicata* only as to matters embraced in the account approved. (Surrogate's Court Act, § 274; *Matter of Hubbell,* 302 N. Y. 246, 253; *Joseph* v. *Herzig,* 198 N. Y. 456, 461.) We cannot determine the conclusive effect of a decree which we have not seen. As to certain of the charges against Mr. Moot, the objections state that his accounts failed to reveal material facts to the court. For example, his account is said to have reported the sale of certain trust assets without revealing the purchaser, " and, accordingly, the propriety of the sale to the Corporation has not hitherto been reviewed by any court." (*Matter of Hubbell, supra,* p. 254.) Furthermore, one of the objections is to alleged misconduct in procuring the releases or consents, and as the merits are not before us, we do not think we can restrict the examination on any theory of *res judicata.*

The record also contains certain schedules, supplied by Mr. Moot, disclosing information concerning Wildroot Co., Inc. Schedule " B " records the dividends paid on Wildroot stock. No dividends were paid on common stock in the later years of the depression. Beginning in 1942 the common stock dividends increased steadily until 1946, but have decreased annually since that date. Progressively larger amounts of profits have been transferred to surplus for a decade. In 1949, of net profits (after taxes) of $997,455.16, only $40,691.58 was distributed as preferred and common dividends, and the balance of $956,768.58 was transferred to surplus. For the first six months of 1950

the corporation distributed $14,095.78 in dividends and transferred $1,243,260.20 to surplus. In each year since the accounting trustee acquired a vested remainder in the second trust (nine sixteenths of the entire estate), the amounts distributed as preferred and common dividends have steadily decreased, while net profits after taxes have steadily increased. Such could only result in enriching the remaindermen at the expense of the life tenant. Of course, this is no derivative stockholders' action, and the objector does not claim to be entitled to a review of the corporate dividend policy as such. He does seek to determine, however, the extent to which that policy was proposed, supported, or favored, by Mr. Moot, whose duty was one of undivided loyalty to all the trust beneficiaries. Mr. Moot, on the other hand, takes the position that the corporate " screen " precludes inquiry into his acts as an officer and director.

The duty of a trustee is easily defined because it is absolute. " The rule is inflexible that a trustee shall not place himself in a position where his interest is or may be in conflict with his duty ". (*Matter of Lewisohn,* 294 N. Y. 596, 608.) " The law permits no one to act in such inconsistent relations. It does not stop to inquire whether the contract or transactions was fair or unfair. It stops the inquiry when the relation is disclosed ". (*Munson* v. *Syracuse, Geneva & Corning R. R. Co.,* 103 N. Y. 58, 74; *Matter of People* [*Bond & Mtge. Guar. Co.*], 303 N. Y. 423, 431.) " Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place." (*Meinhard* v. *Salmon,* 249 N. Y. 458, 464.) " Only by this uncompromising rigidity has the rule of undivided loyalty been maintained against disintegrating erosion." (*Wendt* v. *Fischer,* 243 N. Y. 439, 444.) These principles have numerous practical applications. Thus, a trustee ordinarily owes a duty to the *cestui* not to buy at a sale of the trust property. (3 Bogert on Trusts & Trustees, § 543; *Matter of Hubbell,* 302 N. Y. 246, 255; *Fulton* v. *Whitney,* 66 N. Y. 548.) Similarly, " Although the trustee is not under a duty to the beneficiary entitled to the income to endanger the safety of the principal in order to produce a large income, he is under a duty to him not to sacrifice income for the purpose of increasing the value of the principal ". (Restatement, Trusts, § 232, comment b; *Matter of Jacobs,* 154 Misc. 362, 364.) Furthermore, it may be improper for an executor or trustee to accept a salary as officer of an " estate corporation ". (*Matter of Hirsch,* 116 App. Div. 367, affd. 188 N. Y. 584.)

In *Matter of Horowitz* (297 N. Y. 252, 258) Desmond, J., stated: "An executor who, to carry out his trust, becomes a director of a corporation in which the estate's moneys are invested, remains an executor and is held to the full duty of an executor".

In *Matter of Auditore* (249 N. Y. 335) Frank and Joseph Auditore each held 50% of the stock of a contracting corporation. The stock became the chief asset of Joseph's estate, of which Frank became coadministrator *c. t. a.,* continuing as an officer and director of the corporation. Frank was an officer and director before Joseph died, but had absolute control thereafter. He misappropriated all of the assets of the corporation, rendering the stock worthless. A derivative stockholders' action resulted in a judgment in favor of the corporation for these peculations, uncollectible because Frank was bankrupt. He was removed as administrator, and on the settlement of the accounts of the coadministratrix a decree was entered charging Frank with the loss to the estate by reason of the misappropriation. The Court of Appeals held that Frank and the surety on his bond were liable for the thefts. The case holds squarely that for a wrong to the corporation committed in Frank's capacity as an officer and director, he may be liable to the estate. The value of the stock — the estate's chief asset — was reduced by his misappropriation, for which he had already been held liable to the corporation. But that judgment was held not *res judicata,* nor exhaustive of Frank's liability for breach of his other trust.

There are numerous lower court cases bearing generally on this question, but we think they are not controlling here. Delehanty, S., has stated (*Matter of Witkind,* 167 Misc. 885, 893, 894): "It is not disputed that where a corporation is wholly owned by an estate full report of corporate transactions may be exacted of the fiduciaries. * * * It is also an established principle that in the ordinary case where an estate has only a minority interest in a corporation the fiduciaries cannot be required to render an account of corporate transactions. *This principle is one of practical necessity. Fiduciaries cannot be ordered to do what is impossible.* But where as here the fiduciaries control a corporation by the help of the estate stock interest added to the stock interest held personally by one of them they are not disabled to make such accounts and are, therefore, under obligation to do so." (See, also, *Matter of Steinberg,* 153 Misc. 339; *Matter of Rappaport,* 96 N. Y. S. 2d 741; *Matter of Sullivan,* 169 Misc. 16, affd. 255 App. Div. 1008, and

*Matter of Ebbets,* 149 Misc. 260; cf. *Matter of Barrett,* 168 Misc. 937, and *Matter of Davidson,* 89 N. Y. S. 2d 221.)

In *Matter of Hubbell* (59 N. Y. S. 2d 325, affd. 270 App. Div. 947) H. and W. each owned 50% of the stock of a realty corporation. H. was director and president of the corporation and life beneficiary and cotrustee of a trust created by W's will. The trustees were authorized to invade principal to supply H. with an annual income of $10,000, and since the corporation was operated at a loss, the $10,000 was annually raised by sale of part of the estate shares to the corporation, so that the estate holding dwindled from 50% to a minority interest. In an accounting proceeding it was held that the remaindermen could examine the trustees under section 263 of the Surrogate's Court Act regarding the corporate affairs. " Since the purchase of the estate stock by the corporation enhances the value of the shares held by the husband individually, a proper subject of inquiry is whether or not the affairs of the corporation have been properly managed by him and his co-trustee " (p. 327). When the case reached the Court of Appeals, Judge FULD stated (302 N. Y. 246, 254) : " Where, as here, the trustees own, in their individual and representative capacities, the entire outstanding stock of a corporation, that [fiduciary] duty extends not only to the trust estate as such but also to the operations of the corporation." And at page 259 : " A trustee may not be heard to assert that the corporate form of organization compels an otherwise unjustifiable extinction of the interest of the remaindermen in instances where, by reason of his stock ownership as individual and as trustee, he could have prevented it. Under such circumstances, if an irreconcilable conflict between self-interest and fiduciary responsibility develops, the choice of the trustee is either to subordinate the former or resign."

The foregoing cases generally require that before a trustee *must account or submit to examination regarding the general business affairs of a corporation,* he must be dependent upon the estate stock for his connection with the corporation. If a testator leaves a business in his estate, his executors must account for their operation of it. It is no different if he leaves in trust 100% of the stock of a corporation. While the trustees elect themselves officers and directors, they actually operate the business as representatives of the estate. They must, therefore, reveal to the beneficiaries *all facts concerning the management of the estate. (Farmers' Loan & Trust Co.* v. *Pierson,* 130 Misc. 110.) And if that type of disclosure is sought, it is reasonable

to require a showing that the combined holdings of the trustee and the estate, or the latter alone, constitute a majority or controlling interest in the corporation. The estate and the corporation may be so nearly identical that the Surrogate, in his control of the trustees, may direct corporate action to be taken by them (*Matter of Adler,* 164 Misc. 544) or even order the corporation to be dissolved (*Matter of McLaughlin,* 164 Misc. 539).

There is a distinction, however, between cases in which the court has reviewed, or required disclosure of, the general corporate affairs, ignoring the corporation, or treating it as an adjunct of the estate, and cases in which particular conduct of a particular person is scrutinized for evidence of breach of trust. This is no derivative stockholders' action. The objector is not seeking to compel the declaration of a dividend, or review corporate action in that sense. He does claim, and in our judgment the *Auditore* case (*supra*) holds, that a trustee whose conduct as officer and director is motivated by self-interest, to the injury of beneficiaries whose welfare should be his sole concern, is guilty of a breach of trust and should be surcharged. The *Auditore* case does not depend on majority ownership. The misappropriations of the executor in that case would have been just as much a breach of trust if he had owned no stock whatsoever. The corporate entity has always been disregarded where necessary to prevent fraud. (*Quaid* v. *Ratkowsky,* 183 App. Div. 428, affd. 224 N. Y. 624.)

In the instant case, it is true that Mr. Moot was an officer and director of Wildroot as early as 1930. It is also true that the estate stock (originally 19,656 shares), added to that held by the Moot family (1,000 shares before March 1, 1946, and 1,100 shares thereafter), is not a majority of the outstanding common shares (45,463 before March 1, 1946, and 50,000 thereafter). However, deponent and his law partner are two of the four living voting trustees of a voting trust holding control of Wildroot Co., Inc. That trust, like its predecessor, was entered into for the purpose of assuming such control, and maintaining the management of the corporation. The voting trust is chiefly supported by the estate stock, which Mr. Moot and Mrs. Shehan deposited thereunder without court approval. It is fair to assume that Moot's connection with Wildroot is a good deal more secure because of the voting trust and the estate stock. His entire family owns scarcely more than 2% of the outstanding common. He has surrendered to himself and others, as

voting trustees, the right to vote the estate stock, yet he insists that he may not be examined in that capacity, but only as trustee of the Shehan estate. It is apparent that he has assumed a variety of possibly inconsistent positions — trustee, voting trustee, remainderman, director, etc. Perhaps he cannot serve so many interests with undivided loyalty. It would be the purest accident if the same dividend policy would be for the best interests of life tenant, remainderman, and corporation alike. The accumulation of earnings has certainly been suspiciously large in recent years, as disclosed by the Exhibit " B ". Without doubt, the dividend policy pursued has enriched Mr. Moot at the expense of the life tenant. There may be no actual fraud involved, but a trustee must avoid, not only the fact of fraud, but also the appearance of fraud. We think that in a case of this kind, where the charge is fraud, and the circumstances are susceptible of an *assertion* of suspicion, there is no reason to insist upon a showing that the estate owns a majority of the stock, or that the trustee's connection with the corporation is mathematically traceable to his control of the estate stock. One can control a corporation with considerably less than 51% of its stock, depending on the nature of the corporation and the distribution of its shares. In *Matter of Schrier* (81 N. Y. S. 2d 467) the estate held a minority of the stock of a corporation. It was not shown that the trustees individually owned any shares. McGAREY, S., vacated a subpoena duces tecum requiring a general production of the corporate books, but did require the corporation to produce, on an examination of the trustees pursuant to section 263 of the Surrogate's Court Act, all records revealing the money paid by it to them in their individual and fiduciary capacities. That is the sort of narrow examination which is sought in this case, designed solely to determine whether there has been a breach of trust. We think the objector should be permitted a broad inquiry into Mr. Moot's conduct as an officer and director of Wildroot Co., Inc., with respect to his role in the determination of its dividend policies. Of course, there can be no inquiry as to anything he may have done before he became executor and trustee. (See *Matter of Underwood,* 217 App. Div. 128.)

The decree appealed from requires Mr. Moot to produce " all books, papers, records and documents as relate to his administration of the fund ". The petition sets forth the books and records which the objector wants. The prayer is too broad. Some of the records would clearly be irrelevant and outside the

scope of the examination. Some have already been furnished. Others apparently do not exist. The petition for the order to show cause alleges, upon information and belief, that, as director and secretary of Wildroot, Mr. Moot has the custody of its books and records. Subdivision 1 of section 296 of the Civil Practice Act provides: '' If the deposition is to be taken pursuant to an order, the order may require, in a proper case, the production of books and papers *in the custody of the party or person to be examined,* as to the contents of which an examination or inspection is desired ''. (Italics supplied.)

We think that in every case in which a trustee may properly be examined as an officer and director of a corporation, to the same extent, and by the same reasoning, he may be directed to produce on his examination the corporate books and records so far as they relate thereto, and are in his custody. Otherwise, the examination is likely to be worthless.

The order herein should, therefore, be modified by adding thereto the following additional ordering paragraph: '' and it is further ordered that said Welles V. Moot be examined as a voting trustee under those certain voting trust agreements entered into November 29, 1933, and September 23, 1942, regarding his acts and conduct as such voting trustee during the period from January 23, 1942, to July 5, 1950, and further examined as a director and officer of Wildroot Co., Inc., regarding his participation in, and his attitude toward, the policies of said corporation with regard to declaration of dividends and accumulation of surplus during the period from January 23, 1942, to July 5, 1950, and that he produce upon said examination all books, records, papers and documents in his custody, in any capacity whatsoever, which reveal or pertain to his conduct as such voting trustee, and his participation in and attitude toward such corporate policies during such period.'', and as modified, affirmed.

All concur. Present — McCurn, P. J., Vaughan, Kimball, Wheeler and Van Duser, JJ.

Order insofar as appealed from modified in accordance with the opinion and as modified affirmed, without costs of this appeal to any party.