Eric F. SALTZMAN and Victoria M. Saltzman, Petitioners–Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.

Arnold SALTZMAN and Joan Saltzman, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Nos. 217, 910, Docket 96–4195, 96–4203.

United States Court of Appeals, Second Circuit.

Argued Oct. 3, 1997.

Decided Dec. 11, 1997.

Robert W. Metzler, Tax Division, Department of Justice, Washington, DC (Loretta C. Argrett, Assistant Attorney General, Richard Farber, Department of Justice, Washington, DC, on the brief), for Respondent–Appellee.

Kenneth W. Gideon, Washington, DC (Ruth E. Kent, Wilmer, Cutler & Pickering, Washington, DC, of counsel), for Petitioners–Appellants.

Before: VAN GRAAFEILAND, McLAUGHLIN, Circuit Judges, and COTE, District Judge.*

VAN GRAAFEILAND, Circuit Judge:

Arnold Saltzman and Joan Saltzman, his wife, appeal from a decision of the United States Tax Court finding them liable for a gift tax deficiency of $978,960 and imposing negligence penalties totalling $575,953.[1] For the reasons hereafter discussed, we reverse and remand.

The record in this case fills 10 large packing boxes. Much of it has been ordered sealed. For purposes of this opinion, we see no reason to take the reader through the

---

\* The Honorable Denise Cote of the United States District Court for the Southern District of New York, sitting by designation.

1. Although the parties in the case of *Eric F. Saltzman and Victoria M. Saltzman v. Commis-* sioner of Internal Revenue, No. 96–4195, have not taken an active part in this appeal, a reversal or modification of the decision in the instant case, No. 96–4203, will affect the outcome of their case, No. 96–4195. Accordingly, case No. 46–4195 has been included as a companion case.

entire record, separating sealed from unsealed as we do so. We limit our discussion to two basic issues:

I. Did the Tax Court err in holding that one of two trustees could make a gift of trust property to a non-beneficiary without the knowledge or consent of the trust beneficiaries?

II. Did the Tax Court err in its evaluation of the property in question?

I

Between 1976 and 1981 Arnold Saltzman (hereinafter "Arnold"), who owned almost all the stock of Marian B., Inc. ("MBI") and Newgate Inc. (subsequently merged into MBI), created irrevocable trusts consisting primarily of MBI stock for the benefit of two of his three children, Robert and Marian. Arnold's third offspring, Eric, received his proportionate gift directly and he subsequently purchased Arnold's remaining shares. Portions of Robert's and Marian's shares thereafter were transferred into trusts for Arnold's grandchildren, Xylon and Chloe.

Arnold and his long-time attorney and accountant, Stanley Haber, who died prior to trial, were named co-trustees of the four trusts. All decisions of the trustees were to be made unanimously and in no event was Arnold to have the right and power to act as sole trustee. The trust agreements provided further that "no powers enumerated herein or accorded to trustees generally, pursuant to law, shall be construed to enable the Grantor or the Trustees or any other person to purchase, exchange or otherwise deal with or dispose of the principal or income of the trust for less than an adequate or full consideration in money or money's worth." However, in 1986, Arnold and Haber, who were the directors of MBI, effected such a disposition of the trusts' common stock by means of a recapitalization of MBI, pursuant to which the trusts' common stock was exchanged for preferred stock of a substantially lesser value. The exact amount of the difference in value is the second item in dispute herein. This transaction was accomplished without court approval and without the knowledge of

the trust beneficiaries, two of whom were minors. Stating that petitioners' argument that Arnold could not change the beneficiaries or revoke the trusts constituted a "pristine view" of his authority, the Tax Court concluded that "the recapitalization was a gift from Arnold Saltzman to Eric Saltzman in 1986." In thus holding, the Tax Court erred as a matter of law.

 In determining ownership of the trust stock that was recapitalized, we must look to the law of New York where the trusts were created and the recapitalization took place. The federal revenue law " 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.' " *United States v. National Bank of Commerce,* 472 U.S. 713, 722, 105 S.Ct. 2919, 2925, 86 L.Ed.2d 565 (1985) (quoting *United States v. Bess,* 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958)). *See also United States v. Mitchell,* 403 U.S. 190, 197, 91 S.Ct. 1763, 1767, 29 L.Ed.2d 406 (1971) ("In the determination of ownership, state law controls."); *United States v. Sterling Nat'l Bank & Trust Companies of N.Y.,* 494 F.2d 919, 921 (2d Cir.1974) ("The question of whether the bank held property or a right to property of Smith is one of state law, in this case New York's.").

The courts of no other state have emphasized more strongly the duties and obligations of trustees than have the courts of New York. In Judge Cardozo's oft-quoted opinion in *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928), he summarized them as follows:

Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. *Wendt v. Fischer,* 243 N.Y. 439, 444[154

N.E. 303] [1926]. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

*Id.* at 464, 164 N.E. 545.

In *Birnbaum v. Birnbaum,* 73 N.Y.2d 461, 541 N.Y.S.2d 746, 539 N.E.2d 574 (1989), the New York Court of Appeals, citing *Meinhard,* reiterated that "it is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." *Id.* at 466, 164 N.E. 545. *See also Matter of Lewisohn,* 294 N.Y. 596, 608, 63 N.E.2d 589 (1945), where the court said "[t]he rule is inflexible that a trustee shall not place himself in a position where his interest is or may be in conflict with his duty."

▇▇ The recapitalization was accomplished by Arnold and Haber in their roles as directors of the corporation. However, pursuant to the inexorable dictates of trust law, they also were acting in their capacities as trustees who owed the trust beneficiaries the absolute duty of undiluted loyalty. A trustee cannot "alter his legal position by changing his cloak." *Matter of Grace,* 42 Misc.2d 214, 217, 247 N.Y.S.2d 695 (N.Y.Sur.1964). Although a trustee, in the course of his administration, may become an officer of a corporation, his duties as a corporate officer do not supplant or mitigate the duties he owes the trust beneficiaries. *See Matter of Horowitz,* 297 N.Y. 252, 258–59, 78 N.E.2d 598 (1948); *Matter of Auditore,* 249 N.Y. 335, 342–43, 164 N.E. 242 (1928); *Matter of Shehan,* 285 A.D. 785, 793, 141 N.Y.S.2d 439 (1955) ("While the trustees elect themselves officers and directors, they actually operate the business as representatives of the estate."). In short, the Tax Court erred as a matter of law in holding that Arnold "did not make the transfer in his capacity as trustee."

▇▇ Moreover, if, as the Tax Court held, Arnold was the one who made the gift, his act was in clear violation of the trusts' provision that Arnold and Haber, the co-trustees, had to act as a unit. Their powers as co-trustees were undivided and neither could act separately. *See Bitker v. Hotel Duluth*

*Co.,* 83 F.2d 721, 723 (8th Cir.1936); *Kane v. Lewis,* 282 A.D. 529, 530, 125 N.Y.S.2d 544 (1953); *Cooper v. Illinois Central R.R. Co.,* 38 A.D. 22, 28, 57 N.Y.S. 925 (1899); RESTATEMENT (SECOND) OF TRUSTS § 1942.

Section 288 of the RESTATEMENT (SECOND) OF TRUSTS provides:

> If the trustee in breach of trust transfers trust property to a person who takes with notice of the breach of trust, the transferee does not hold the property free of the trust, although he paid value for the transfer.

Comment (a) thereunder elaborates on the scope of the rule as follows:

> The interest of the beneficiary in the trust property is not cut off by a transfer by the trustee in breach of trust to a third person who at the time of the transfer has notice that the transfer is in breach of trust, although he paid value for the transfer; and the beneficiary can in equity compel the third person to restore the property to the trust. The third person holds the interest which he acquires by the transfer upon a constructive trust for the beneficiary of the trust.

This is the law of New York. *See Renz v. Beeman,* 589 F.2d 735, 744 (2d Cir.1978); *see also Albright v. Jefferson County Nat'l Bank,* 292 N.Y. 31, 40, 53 N.E.2d 753 (1944); *Wendt v. Fischer, supra,* 243 N.Y. at 444, 154 N.E. 303. The alleged gift from Arnold to Eric was imperfect or inchoate rather than consummate.

In *Burnet v. Guggenheim,* 288 U.S. 280, 53 S.Ct. 369, 77 L.Ed. 748 (1933), the Court held that the gift statute "is aimed at transfers of the title that have the quality of a gift, and a gift is not consummate until put beyond recall." *Id.* at 286, 53 S.Ct. at 371. That holding has been followed consistently. *See, e.g., Smith v. Shaughnessy,* 318 U.S. 176, 181, 63 S.Ct. 545, 547, 87 L.Ed. 690 (1943) ("The separable interests transferred are not gifts to the extent that power remains to revoke the trust or recapture the property represented by any of them[.]") (citing *Burnet* )); Rev. Ruling 74–365.

Moreover, *Burnet* is applicable not only where the grantor has expressly reserved the

right to revoke the conveyance but also where a right arises by indirection or operation of law. 5 BITTKER, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 122.3.1 (1984); *Dodge v. United States*, 413 F.2d 1239, 1242–43 (5th Cir.1969). *Commissioner v. Allen*, 108 F.2d 961, 963 (3d Cir.1939), *cert. denied*, 309 U.S. 680, 60 S.Ct. 718, 84 L.Ed. 1023 (1940); *Berger v. United States*, 487 F.Supp. 49, 52 (W.D.Pa.1980).

 One who receives property as a result of a breach of trust holds the property in constructive trust. This does make him a trustee as that term generally is used. "In the case of a constructive trust, the duty is merely to surrender the property." V SCOTT ON TRUSTS § 462.1 at 3415 (3d ed.1967); *see also Coco v. Coco*, 107 A.D.2d 21, 24–27, 485 N.Y.S.2d 286, *appeal dismissed*, 65 N.Y.2d 637 (1985). In the face of this duty, the transfer of property by a trustee in violation of his fiduciary obligations cannot be said to be final or consummate. It therefore is not taxable as a gift.

 Petitioners have argued for the same result by relying on Treas. Reg. § 25.2511–1(g)(1), which provides in pertinent part:

> A transfer by a trustee of trust property in which he has no beneficial interest does not constitute a gift by trustee (but such a transfer may constitute a gift by the creator of the trust, if until the transfer he had the power to change the beneficiaries by amending or revoking the trust).

This regulation must be sustained unless it is unreasonable and plainly inconsistent with the revenue statutes. *United States v. Cartwright*, 411 U.S. 546, 557, 93 S.Ct. 1713, 1719, 36 L.Ed.2d 528 (1973). We see no such inconsistency here.

We are not dealing here with a tax on income, taxable no matter how received. *Cf. James v. United States*, 366 U.S. 213, 218, 81 S.Ct. 1052, 1054, 6 L.Ed.2d 246 (1961); *Collins v. Commissioner*, 3 F.3d 625, 630–31 (2d Cir.1993). We are dealing instead with a proposed gift tax levied upon an alleged donor who was not a recipient of income.

Arnold had no beneficial interest in the trusts, which specifically provided:

> By this instrument the Grantor intends to and does hereby relinquish, absolutely and forever, all possession or enjoyment of, or right to the income from the property, whether directly, indirectly or constructively, and every interest of any nature, present or future, in the trust property.

As stated above, the Tax Court clearly erred in holding that Arnold "did not make the transfer in his capacity as a trustee." The Court apparently believed that if Arnold's conduct "was not like that of a trustee" he no longer should be treated as a trustee. That is not the law. *See Matter of Hubbell*, 302 N.Y. 246, 254–60, 97 N.E.2d 888 (1957).

## II

Assuming for the purpose of argument that the Tax Court did not err in holding Arnold liable for a gift tax and penalties, it clearly erred in the manner in which it computed their amount. The reasons for our holding require a somewhat more detailed review of the facts than already is contained herein.

Prior to 1955, RKO, an early participant in the film industry, created a film library consisting of approximately 750 feature films and about 1000 short films. In 1955, RKO sold a substantial portion of its interest in these films to C & C Television Corp. Thereafter, TransBeacon Corp. succeeded to C & C's interest in the 1955 sales contract. In 1971, after TransBeacon had been adjudicated a bankrupt, MBI purchased most of this same interest from the trustee in bankruptcy for $119,600.

From the outset, there has been a dispute as to exactly what rights C & C acquired in its 1955 purchase.

For example, among these rights was the right to broadcast and to license broadcasts of the films by means of "toll television." The agreement provided: "The term 'toll television' shall be deemed to refer to the broadcast of any picture hereunder solely through the medium of so-called subscription television by means of Telemeter, Skiatron, Phonevision or any other similar development on programs for which a charge is

made to the audience for the privilege of receiving or viewing the same in the home."

Because of the changes and advancements that have taken place in the television industry since 1955, the exact scope of "toll television," as thus defined, is far from clear. The Tax Court's pat assertion that " 'Toll Television' is television transmission for which the viewer is charged a fee" simply will not do.

The Tax Court's equally facile denigration of MBI's title problems is belied by the Court's own words. For example, in 1982, MBI sued RKO alleging impingement by RKO on MBI's television rights. In its defense, RKO challenged MBI's claim of title, including MBI's interpretation of the term "toll television." As the Tax Court described the situation: "RKO knew MBI acquired title to the films from the TransBeacon bankruptcy. RKO knew that there were potential title problems and alleged them in its answer when MBI sued them." [2] At another point, describing RKO's subsequent purchase from MBI of the film rights at issue, the Tax Court said:

> We accept petitioners' proposed finding of fact No. S26 that O'Connor testified that MBI's and RKO's title to cable rights to the pre–1956 RKO library was not free from adverse claims. However, O'Connor's testimony does not change our conclusion because we believe RKO knew about the title problems when it bought the film rights from MBI.

Because of these title problems, MBI was unable to purchase errors and omissions insurance and would not expose itself to liability by giving the warranties of title that are standard in the industry.

In 1984, MBI created Marian Pictures Incorporated ("MBP"), a wholly-owned subsidiary, to which it transferred its above described interests as a device for escaping liability arising out of possible improper use of its cable operations. In 1984, MBP entered into a two-year renewable agreement with RKO pursuant to which RKO could license to Rainbow Classics Film Corp. the rights obtained by MBI in the 1983 settlement. Richard Ballinger, a witness with over twenty years of experience in the purchase of films, motion pictures and syndicates who helped to negotiate the contract, described it as follows:

> This is a unique document for several reasons. Number one, usually when you negotiate a film contract, the underlying rights are secure. This document represents—this library had very insecure underlying rights. They were very confused. The terminology and language was confusing. It was archaic, the underlying rights, and confusing. There were various issues. One party had a negative veto power over the other two parties' right to sell. There were strange things like RKO indemnified the Saltzmans, which is unique. It was impossible to get an errors and omissions policy on this library. It was sold both to free broadcasters and cable, which was unique. There were even free broadcasters who had rights in perpetuity. The underlying rights on this contract were very cloudy.

On or about April 24, 1986, Arnold and Haber effected the recapitalization, the action that created the issue now before us. Like the organization of MBP, this was done for the asserted purpose of protecting the holders of MBI common stock from liability. In the recapitalization, Arnold and Haber valued MBI's common stock at a close to zero figure because of MBI's questionable title. The Tax Court stated its belief that the trustees' title concerns were "exaggerated" and "not bona fide." In arriving at this belief, the Court admitted that it did not rely on conclusions at least somewhat to the contrary voiced separately by four attorneys who were asked by MBI to evaluate the merits of its title. At Arnold's request, the letters containing the reports of these lawyers have been sealed because of his concern that publication of their contents might invite litigation. However, the sealing of the letters did not mean that the Tax Court was free to disregard them.

Seven months after the recapitalization, RKO bought MBI's interest for $8 million.

---

**2.** In 1983, MBI and RKO settled their litigation by splitting the right to license the pre–1956 RKO library between them and giving each party rights and obligations with respect to the other.

**93**

The Tax Court based its computation of the gift tax on this amount.

We review de novo the criteria used by the Tax Court in determining the value of the stock involved in the recapitalization. *See Powers v. Commissioner*, 312 U.S. 259, 260, 61 S.Ct. 509, 510, 85 L.Ed. 817 (1941); *Estate of Palmer v. Commissioner*, 839 F.2d 420, 423 (8th Cir.1988). Where, as here, the valuation of closely-held stock is at issue, this generally must be accomplished "without reference to events which occur after the date of the donation." *Krapf v. United States*, 977 F.2d 1454, 1458 (Fed.Cir.1992). An exception to this rule may be made where nothing that significantly affected the value occurred between the date of the gift and the subsequent event. *See Estate of Kaplin v. Commissioner*, 748 F.2d 1109, 1111 (6th Cir. 1984).

However, subsequent events are not considered in fixing fair market value except to the extent that they were reasonably foreseeable on the date of the gift. *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 894 (7th Cir.1985). In *Commissioner v. Estate of Hubert*, — U.S. —, — – —, 117 S.Ct. 1124, 1129–30, 137 L.Ed.2d 235 (1997), the Court, in holding that a charitable deduction had to be valued based on the probable life expectancy of the donor's wife as of the donor's death rather than on the known fact that she died only six months after her husband, quoted with approval Justice Holmes' opinion in *Ithaca Trust Co. v. United States*, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), where he said: "[Value] depends largely on more or less certain prophecies of the future; and the value is no less real at that time if later the prophecy turns out false than when it comes out true...."

In 8 MERTINS LAW OF INCOME TAXATION at § 31.55 under the heading "Future Events" the rule is stated correctly as follows:

A taxpayer may not consider unexpected events happening after his contribution of property in making the valuation. He may consider only the facts known at the time of the gift, and those that could be reasonably expected at such time.

In the instant case, the Tax Court flatly rejected the requirement of foreseeability. The Commissioner conceded that the December 1986 sale to RKO was not foreseeable. Despite the well-established authority to the contrary, the Tax Court held that foreseeability was not required and therefore was not an issue in this case. This was clear error.

The issue of foreseeability aside, the December 1986 sale cannot be considered for purposes of valuation unless RKO was not under "any compulsion to buy." 26 C.F.R. § 25.2512–1. *See United States v. Cartwright*, *supra*, 411 U.S. at 551, 93 S.Ct. at 1716. The Tax Court said: "Petitioners did not convince us that RKO was compelled to buy the film library." The reason for this is that by a series of evidentiary rulings that rejected or limited most of the evidence offered by MBI on this issue, the Court did not permit itself to be convinced. Although evidentiary rulings generally do not constitute reversible error, they may do so where, as here, they affect a party's substantial rights. *Curreri v. International Bhd. of Teamsters*, 722 F.2d 6, 12 (1st Cir.1983); Fed.R.Evid. 103.

Most of the evidence on the issue of compulsion was presented through the testimony of Kevin O'Connor. In 1986, O'Connor was Associate General Counsel and Assistant Secretary of RKO General, RKO Pictures, and several other subsidiaries of Gencorp. RKO General ran the other subsidiaries pursuant to an operations agreement. In the summer of 1986, the management of RKO Pictures decided that they wanted to buy out that company. They formed a corporation called Entertainment Acquisitions Company to accomplish this purpose, and O'Connor was named Associate General Counsel of that company. During the ensuing months, a tentative purchase price of $8 million was agreed upon. However, there were many details yet to be worked out before a binding contract could be entered into. It was at this point that O'Connor got involved.

In late November of 1986, O'Connor was asked by Mark Syler, President of RKO Pictures, to attend a meeting between RKO officials and the Saltzmans. He was instructed to work out the terms of the proposed

contract of purchase and was given orders concerning what to negotiate and what to preserve. From time to time he also discussed his assigned task with "Jeffrey Offsay, Vice President of RKO Products, RKO General management, and Gencorp management—Chuck Ennes, Oliver Janney, the President of RKO General, and other officers." In the course of these conferences it was made clear to O'Connor that unless the $8 million purchase was consummated, financial backing for the buy-out deal would not be forthcoming.

When questioned on direct examination why RKO paid $8 million, he answered: "Well we were up against the wall. We had to buy it for the management deal." Upon questioning by the court, O'Connor testified: "We only bought them out because we had to." However, when O'Connor was asked who furnished him this information, he either was precluded from answering, or the answer was treated as hearsay, admissible only as it affected O'Connor's (not RKO's) state of mind. This was error.

Because of petitioner's contention that the $8 million paid by RKO for MBI's stock was greatly in excess of the stock's value, RKO's motivation for this allegedly unusual purchase was a material fact of utmost importance. "Why," one asks, "did RKO do it?" The answer can be found in the instructions given O'Connor by his superiors. Once O'Connor was assigned the task of negotiating the contract of purchase, he became RKO's agent. His recount of statements by his superiors concerning their reason and intent for paying $8 million should have been received for that purpose.

In the seminal case of *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 295, 12 S.Ct. 909, 912, 36 L.Ed. 706 (1892), the Court said:

> The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact, as his own testimony that he then had that intention would be.

■ Federal Rule of Evidence 803(3) is predicated in substance upon the *Hillmon* holding. Read together, the case and the

Rule stand for the proposition that "[a] declarant's out-of-court statement of intent may be introduced to prove that the declarant acted in accordance with that intent." *United States v. Delvecchio,* 816 F.2d 859, 863 (2d Cir.1987); *see United States v. Torres,* 901 F.2d 205, 239 (2d Cir.1990); *United States v. Badalamenti,* 794 F.2d 821, 826 (2d Cir. 1986); *see also Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671, 693–94 (6th Cir. 1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981); Fed.R.Evid. 803(24).

The evidence that the Tax Court refused to consider went squarely to the issue of whether RKO was a willing purchaser under no compulsion to buy. *See Brooks v. Willcuts,* 78 F.2d 270, 272 (8th Cir.1935). It should have been admitted and given proper consideration by the Tax Court.

On the basis of the present record, we hold that the Tax Court erred in adopting the December 1986 sales price as "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts" as required by 26 C.F.R. § 25.2512–1.

### CONCLUSION

Both of the questions presented at the outset of this opinion are answered in the affirmative. The decision of the Tax Court is reversed and the matter is remanded to that Court for further proceedings consistent herewith. Before proceeding further, the Commissioner and the Tax Court may deem it advisable to give the Saltzman family an opportunity to seek a judicial determination of the ownership of the proceeds of the December 1986 sale. In addition to its effect in the case of Arnold and Joan, a decision on this issue may assist the Commissioner and the Tax Court in determining Eric and Victoria Saltzman's tax liability in the companion case number 96–4195.