J-A24030-24                    2025 PA Super 82

| | | |
|---|---|---|
| IN RE:  CREDIT TRUST UNDER THE WILL OF WILLIAM R. CAMERON, JR., DECEASED; CAMERON FAMILY TRUST UNDER AGREEMENT DATED " 1992" | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  WILLIAM R. CAMERON III | : : | No. 830 EDA 2024 |

Appeal from the Order Entered May 12, 2023
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2014-E0597

BEFORE:  LAZARUS, P.J., KING, J., and LANE, J.

OPINION BY KING, J.:                              **FILED APRIL 9, 2025**

Appellant, William R. Cameron, III ("Trustee"), appeals from the order entered in the Bucks County Court of Common Pleas, which determined that the Orphans' Court could award a surcharge against a self-dealing fiduciary equal to the total financial benefit received by the fiduciary and/or his non-party family members.  We affirm.

The parties stipulated to the following facts:

1. William R. Cameron, Jr. ("Mr. Cameron") established a revocable trust under an agreement titled "Cameron Family Trust" that was dated with only the year "1992."  (the "Family Trust").

2. Mr. Cameron died on April 22, 1994 a resident of Bucks County, Pennsylvania.  Mr. Cameron left a Will dated August 11, 1993 (the "Will"), which was admitted to probate by the Register of Wills of Bucks County on May 9, 1994.

3. Mr. Cameron was survived by his wife, Lois ("Mrs. Cameron"), and by their four children, [Trustee] and Cynthia J. Carothers ("Cindy"), Robert H. Cameron ("Bob") and Kimberly A. Earley ("Kim").  Collectively, Cindy, Bob and

Kim are ["Appellees."]

4. Mr. Cameron established a unified credit trust under his Will (the "Credit Trust").

5. The Family Trust and the Credit Trust, collectively the "Cameron Trusts," are the subject of this litigation.

**Terms of the Family Trust**

6. Mr. Cameron and [Trustee] were the initial trustees of the Family Trust. After Mr. Cameron died on April 22, 1994, Mrs. Cameron succeeded him and became a co-trustee with [Trustee].

7. On October 10, 2014, [the Orphans'] Court permitted Mrs. Cameron to resign as co-trustee, and appointed Cynthia Carothers as Mrs. Cameron's successor co-trustee with [Trustee].

8. Following Mr. Cameron's death, the Family Trust continued for the benefit of Mrs. Cameron.

9. Mrs. Cameron died on February 16, 2019.

10. Upon Mrs. Cameron's death, the Family Trust terminated and is distributable in equal shares to Mr. Cameron's four children (*i.e.* [Appellees] and [Trustee]).

**Terms of the Credit Trust**

11. [Trustee] has always been the sole trustee of the Credit Trust.

12. The Credit Trust was created for the sole benefit of Mrs. Cameron during her lifetime.

13. Upon Mrs. Cameron's death, the Credit Trust terminated and is distributable in equal shares to Mr. Cameron's four children (*i.e.* [Appellees] and [Trustee]).

**The Litigation**

14. Two [Appellees], Cindy and Bob, are the executors of Mrs. Cameron's Estate.

15. During the course of their administration of the Estate, Cindy and Bob discovered that [Trustee] had obtained a line of credit from Morgan Stanley, using the Cameron Trusts' assets as collateral (the "Express Credit Line").

16. [Appellees] initiated this action on November 6, 2019, by filing a Petition to direct [Trustee] to file an account and to remove him as trustee for each of the Cameron Trusts.

17. [Trustee] filed an Account for each of the Cameron Trusts on September 8, 2020 along with a single Petition for Adjudication. The Account of the Family Trust covers [Trustee's] administration from March 1, 2006 through June 30, 2020. The Account of the Credit Trust covers [Trustee's] administration from January 1, 2009 through June 30, 2020.

18. [Appellees] filed Objections to both of the Accounts and the Petition for Adjudication on October 30, 2020.

19. [Trustee] filed a Reply to those Objections on November 19, 2020.

20. The Family Trust Account reflects that [Trustee] made the following withdrawals from the Express Line of Credit:

| Disbursements | | |
|---|---|---|
| 9/22/2009 | William Cameron & Gina Cameron | 50,001.00 |
| 12/7/2010 | G.B. Binkley, LLC | 50,000.00 |
| 12/7/2010 | Morgan Stanley Smith Barney - wire fee | 25.00 |
| 9/27/2011 | Temple University - tuition payment | 16,307.00 |
| 4/24/2012 | United States Treasury | 9,242.00 |
| 4/24/2012 | United States Treasury | 2,311.00 |
| 4/30/2012 | State of New Jersey TGI | 2,824.00 |
| 4/30/2012 | State of New Jersey TGI | 779.00 |
| 4/17/2013 | ISM, LLC | 5,000.00 |
| 4/19/2013 | ISM, LLC | 30,000.00 |
| 5/10/2013 | ISM, LLC | 10,000.00 |
| 7/26/2013 | Roma Bank | 20,000.00 |
| 8/9/2013 | G.B. Binkley, LLC (Binkley's Store) | 30,000.00 |
| 9/3/2013 | G.B. Binkley, LLC (Binkley's Store) | 25,000.00 |
| 9/25/2013 | G.B. Binkley, LLC (Binkley's Store) | 10,000.00 |
| | | 261,489.00 |

21. None of the funds [Trustee] withdrew from the Express Credit Line were used for the benefit of the Cameron Trusts. All of the funds [Trustee] withdrew from the Express Credit Line were used for the benefit of [Trustee] and his non-party family members, including his wife, Regina Cameron ("Gina"), Gina's daughter, Alana Malone ("Alana"), Alana's husband, David Malone ("David"), and [Trustee's] son, William R. Cameron, IV, none of whom are or were beneficiaries of either of the Cameron Trusts.

22. G.B. Binkley, LLC is an entity owned by [Trustee] and Gina, through which they operated a 5 & 10 store known as Binkley's Store.

23. The real property where Binkley's Store is located is owned by William Cameron Realty, LLC, an entity owned by [Trustee] and Gina.

24. The funds [Trustee] sent from the Express Credit Line to himself and Gina were to install solar panels on Binkley's Store.

25. Roma Bank is the financial institution used by Binkley's Store at the time funds were sent from the Express Credit Line to Roma Bank.

26. The funds [Trustee] sent from the Express Credit Line to Roma Bank were used to pay off a line of credit of

Binkley's Store.

27. [Trustee] and Gina sold the assets of Binkley's Store for $100,000, but they retained the real property, which they lease to the current operator of Binkley's Store.

28. The funds [Trustee] sent from the Express Credit Line to Temple University were to pay tuition for [Trustee's] son, William R. Cameron, IV.

29. The funds [Trustee] sent from the Express Credit Line to the United States Treasury were to pay [Trustee] and Gina's personal federal income tax.

30. The funds [Trustee] sent from the Express Credit Line to the State of New Jersey were to pay Bill and Gina's personal state income tax.

31. ISM LLC is a Colorado entity, through which Alana and David run a marijuana business.

32. The funds [Trustee] sent from the Express Credit Line to ISM LLC were part of the start-up money for ISM LLC.

33. All of the start-up money for ISM LLC was provided by [Trustee] and Gina.

34. ISM LLC did business as Green Dot Labs. In or about 2016, Alana and Dave formed ISM2, Inc., which does business as Green Dot Labs.

35. [Trustee], Gina, Alana, David and William R. Cameron, IV all have received wages and/or employee benefits from ISM LLC and/or ISM2, Inc.

36. At no point did either [Trustee] or Gina Cameron have any equity interest in ISM, LLC or its successor ISM2, Inc.

37. TC Colorado Holdings, LLC, Tuatara Capital Fund I, L.P., and Tuatara Capital Parallel Fund I, L.P. (collectively "Tuatara'") invested $3.3 million in ISM LLC and ISM2, Inc. ("Green Dot Labs") in or about late 2016 or early 2017.

38. Tuatara, in connection with its investment, provided a

pre-money valuation of Green Dot Labs at $5.3 million as of October 11, 2016.

39. Because Colorado law prohibited Tuatara, as a non-resident of Colorado, from owning an interest in either ISM LLC or ISM2, Inc., a new entity, called GDL Inc., was formed.

40. Tuatara, Alana, Dave, [Trustee] and Gina are all owners of GDL Inc.

41. [Trustee] and Gina obtained their equity interest in GDL Inc. without providing any funds to GDL Inc., ISM LLC or ISM2, Inc., other than the funds Bill and Gina provided to startup ISM LLC in 2013.

42. [Trustee] is also a director of GDL Inc.

43. GDL Inc. now owns the tradename Green Dot Labs and licenses ISM2, Inc. to use that tradename.

44. ISM LLC, ISM2, Inc. and GDL Inc. are affiliated entities that are part of a single business enterprise.

(Stipulation, filed 3/30/23, at 1-6) (internal citation omitted).

On March 30, 2023, the parties stipulated to the above-quoted facts for the purpose of submitting cross-motions for partial summary judgment on the following issue:

If a fiduciary is found to have engaged in self-dealing by using trust assets for the benefit of himself and his family, and assuming no loss to the trust, is a surcharge against the fiduciary limited to the "profit" (*i.e.* net gain) received by the fiduciary or may the court award a surcharge relating to the total "benefit" received by the fiduciary and/or his non-party family members who are not beneficiaries of the trust?

(*Id.* at 1).

Trustee filed his partial summary judgment motion on April 28, 2023.

In the corresponding memorandum of law, Trustee argued that Appellees objected to Trustee's

> use of the Morgan Stanley Express Credit Line to loan $45,000 to his stepdaughter's Colorado marijuana company, even though there is no dispute that all withdrawals from the Morgan Stanley Express Credit Line— which is separate and distinct from the Trust funds—were repaid, and the Trust *corpus* itself suffered no loss or damage.

(Memorandum of Law, filed 4/28/23, at 2). Trustee acknowledged that a trustee who commits a breach of trust is liable to the affected beneficiaries. Trustee insisted, however, that "a breach of trust makes the breaching trustee chargeable with any resulting **profit**." (***Id.*** at 4) (quoting ***In re Paxson Trust I***, 893 A.2d 99, 122 (Pa.Super. 2006), *appeal denied*, 588 Pa. 759, 903 A.2d 538 (2006) (emphasis added)). Trustee maintained that the plain meaning of the word "profit" limited Appellees' potential recovery to the "net gain" from Trustee's transactions. (***Id.*** at 6).

Further, Trustee asserted that "[a]n additional issue implied by the certified question before the [Orphans'] Court is whether a fiduciary should be surcharged for an alleged breach of duty if **third parties** benefit from his actions." (***Id.*** at 10) (emphasis in original). Trustee suggested that a fiduciary should not be liable for any benefits that inured to third parties. Moreover, Trustee declared that courts should not penalize third parties due to a fiduciary's breach of duty, which "would be harming innocent parties in contradiction to principles of equity and fairness." (***Id.*** at 11). Trustee

- 7 -

concluded "that if the [Orphans'] Court were to issue a surcharge, it should be limited to 'profit' (*i.e.* net gain) and that it should not apply to any third-party family members." (***Id.*** at 13).

Appellees filed their partial summary judgment motion on May 1, 2023. In the corresponding memorandum of law, Appellees set forth their own theory of the case:

> Because self-dealing by a trustee is such an egregious breach of fiduciary duty, Pennsylvania Courts surcharge self-dealing trustees, even in the absence of any loss to the trust, to the full extent of any benefit the trustee obtained for himself or for third parties who are not beneficiaries of the trust. The surcharge is not limited to how a Court defines the words "profit" or "gain" or "benefit" or "advantage" in a given situation. Instead, the trustee is liable to the trust beneficiaries for the full amount he conferred upon himself or third parties. If his breach of the duty of loyalty led his personal financial position to increase by one dollar, then he can be surcharged one dollar. If his breach enabled family members to start a multimillion-dollar company that has benefited the trustee and his family members (who are not beneficiaries of the trust), then he can be surcharged the amount of the entire financial benefit received by those individuals, whether in the form of wages, dividends, ownership interest in the business or otherwise.

(Memorandum of Law, filed 5/1/23, at 8-9).

By order entered May 12, 2023, the Orphans' Court determined that it "may award a surcharge against a self-dealing fiduciary equal to the total financial benefit received by the fiduciary and/or his non-party family members who are not beneficiaries of the trust." (Order, filed 5/12/23). On June 30, 2023, Trustee filed a petition for permission to appeal the interlocutory order in this Court. This Court granted Trustee's petition on

March 22, 2024. On March 25, 2024, the Orphans' Court ordered Trustee to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Trustee timely filed his Rule 1925(b) statement on March 26, 2024.

On appeal, Trustee now asks this Court to review the same question addressed by the Orphans' Court:

> If a fiduciary is found to have engaged in self-dealing by using trust assets for the benefit of himself and his family, and assuming no loss to the trust, is a surcharge against the fiduciary limited to the "profit" (*i.e.* net gain) received by the fiduciary or may the court award a surcharge relating to the total "benefit" received by the fiduciary and/or his non-party family members?

(Trustee's Brief at 4).

Trustee advances many of the same arguments he raised in the memorandum of law supporting the summary judgment motion. Trustee cites the relevant provisions of the Uniform Trust Act ("UTA"), and he maintains that the plain language of these provisions dictates a narrow reading of remedies, limited to "profits" rather than "benefits." Likewise, Trustee revisits this Court's holding from **In re Paxson Trust I, supra**:

> Pursuant to **Paxson**, and the applicable statute that **Paxson** cites, a trustee is chargeable only with the **profits** made as a result his or her alleged breach of fiduciary duty, even if no harm befell the Trust itself. The term "profit" occurs in the decision no less than 13 times. Thus, contrary to Appellees' interpretation, the **Paxson** Court consistently referred to imposing a penalty based on the "profit" that a fiduciary may have acquired as a result of its alleged breach of fiduciary duty.

(**Id.** at 18-19) (emphasis in original).

Trustee also raises a public policy argument to support a narrow reading of remedies available to Appellees. Trustee complains that "the concept of a 'benefit' is necessarily much broader, more ambiguous and harder to identify or calculate than 'profit.'" (*Id.* at 21). "By way of contrast, however, focusing on 'profit' is easily calculable, easily identifiable, and easily related to specific people, and it is a concept that is easily translatable to an equitable remedy if appropriate." (*Id.*) Trustee adds:

> if the Court were to penalize a fiduciary based on a broader, more generalized concept of "benefit" to the fiduciary, or to his family or relations, this would make it more difficult to craft a remedy and would involve a great deal of speculation and conjecture concerning value. In sum, [Trustee] is asking this Court to limit the chain of causality, again much like what the concept of proximate cause does in tort law, so that clever and venal litigants will not be encouraged to file legal actions to strip innocent third parties of their property.

(*Id.* at 22).

Further, Trustee continues to argue that "the *Paxson* case does not stand for the proposition that if third parties (like [Trustee's] stepdaughter and husband) profited from the trustee's alleged breach of fiduciary duty, the trustee is chargeable with the profit made by those third parties." (*Id.* at 25). Trustee acknowledges our Supreme Court's decision in *In re Noonan's Estate*, 361 Pa. 26, 63 A.2d 80 (1949), a case imposing "liability upon a trustee for the benefits [that] inured to third parties[.]" (*Id.* at 25-26). Trustee concedes that *In re Noonan's Estate* is "superficially similar to the present case," but he still attempts to distinguish it. (*Id.* at 26). Trustee

contends that the remedy authorized by the **Noonan** Court

> was simply to restore the status quo by invalidating the real property transfer. Contrastingly, here, [Appellees] are asking the Court not merely to restore the status quo: they are asking the Court to enrich them with the profits from a third-party corporate entity that they would not otherwise be entitled to.

(**Id.** at 27). Based upon the foregoing, Trustee concludes that if a surcharge is warranted under the circumstances of this case, "it should be limited to 'profit' (*i.e.* net gain) and … it should not apply to any third-party family members." (**Id.** at 34). We disagree.

The following principles apply to this Court's review of an Orphans' Court decision:

> [We] must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the [O]rphans' [C]ourt sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

**Trust of John S. Middleton**, 313 A.3d 1079, 1088 (Pa.Super. 2024) (quoting **In re Vincent J. Fumo Irrevocable Children's Trust ex rel. Fumo**, 104 A.3d 535, 539 (Pa.Super. 2014)).

Regarding questions of statutory interpretation:

> Statutory interpretation is a question of law therefore our standard of review is *de novo*, and our scope of review is plenary. In all matters involving statutory interpretation, we apply the Statutory Construction Act, … which provides

that the object of interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.

Generally, a statute's plain language provides the best indication of legislative intent. We will only look beyond the plain language of the statute when words are unclear or ambiguous, or the plain meaning would lead to a result that is absurd, impossible of execution or unreasonable. Therefore, when ascertaining the meaning of a statute, if the language is clear, we give the words their plain and ordinary meaning.

Where, however, there is a conflict or ambiguity, we may resort to the tools of statutory construction. In so doing, we keep in mind that such tools are used as an aid in uncovering the intent of the Legislature, which is always the objective in matters of statutory construction. When interpreting or applying a statute, it is appropriate to consider official comments. Furthermore, when interpreting a statute, we must presume that the Legislature did not intend to produce an absurd or unreasonable result.

*In re Estate of Ruhlman*, 291 A.3d 916, 921 (Pa.Super. 2023) (internal citations and quotation marks omitted).

The UTA contains the following remedies provision:

### § 7781.  Remedies for breach of trust – UTC 1001

\*    \*    \*

**(b)      Remedies.—**To remedy a breach of trust that has occurred or may occur, the court may order **any appropriate relief**,[1] including the following:

---

[1] We agree with the Orphans' Court's observation that Section 7781(b) "is devoid of language limiting the [Orphans'] Court's redressability of a trustee's breach to profits and losses, as [Trustee] now urges be read into the statute." (Orphans' Court Opinion, filed 5/14/24, at 7).

- 12 -

(1)     Compelling the trustee to perform the trustee's duties.

(2)     Enjoining the trustee from committing a breach of trust.

(3)     **Compelling the trustee to redress a breach of trust by paying money, restoring property or other means.**

(4)     Ordering a trustee to file an account.

(5)     Taking any action authorized by Chapter 43 (relating to temporary fiduciaries).

(6)     (Reserved).

(7)     Removing the trustee as provided in section 7766 (relating to removal of trustee – UTC 706).

(8)     Reducing or denying compensation to the trustee.

(9)     Subject to section 7790.2 (relating to protection of person dealing with trustee – UTC 1012):

     (i)    voiding an act of the trustee;

     (ii)   imposing a lien or a constructive trust on trust property; or

     (iii)  tracing trust property wrongfully disposed of and recovering the property or its proceeds.

(10)    (Reserved).

20 Pa.C.S.A. § 7781(b) (emphasis added).  The Comment to Section 7781 explains:

This section identifies the available remedies but does not attempt to cover the refinements and exceptions developed in case law.  The availability of a remedy in a particular circumstance will be determined not only by this Code but

also by the common law of trusts and principles of equity. *See* Section 106.

\* \* \*

Traditionally, remedies for breach of trust at law were limited to suits to enforce unconditional obligations to pay money or deliver chattels. *See* Restatement (Second) of Trusts Section 198 (1959). Otherwise, remedies for breach of trust were exclusively equitable, and as such, punitive damages were not available and findings of fact were made by the judge and not a jury. *See* Restatement (Second) of Trusts Section 197 (1959). The Uniform Trust Code does not preclude the possibility that a particular enacting jurisdiction might not follow these norms.

The remedies identified in this section are derived from Restatement (Second) of Trusts Section 199 (1959). **The reference to payment of money in subsection (b)(3) includes liability that might be characterized as damages, restitution, or surcharge.**

20 Pa.C.S.A. § 7781, Uniform Law Comment (emphasis added).

"The party seeking to surcharge a fiduciary bears the burden of showing a failure to meet the required standard of care." ***Spinelli by Morris v. Fallon***, 322 A.3d 956, 964 (Pa.Super. 2024) (quoting ***In re Estate of Westin***, 874 A.2d 139, 145 (Pa.Super. 2005)).

In a surcharge action, the propriety of a trustee's investment is judged as it appeared **at the time of investment** and not in light of subsequent changes. Hindsight is not the test of liability for surcharge.

***In re Estate of Warden***, 2 A.3d 565, 577 (Pa.Super. 2010), *appeal denied*, 610 Pa. 580, 17 A.3d 1255 (2011) (internal citations and quotation marks omitted) (emphasis in original).

The UTA's damages provision confirms, "A trustee who commits a

breach of trust is liable to the beneficiaries affected." 20 Pa.C.S.A. § 7782(a).

> Subsection (a) is based on Restatement (Third) of Trusts: Prudent Investor Rule Section 205 (1992). If a trustee commits a breach of trust, the beneficiaries may either affirm the transaction or, if a loss has occurred, hold the trustee liable for the amount necessary to compensate fully for the consequences of the breach. This may include recovery of lost income, capital gain, or appreciation that would have resulted from proper administration. Even if a loss has not occurred, the trustee may not benefit from the improper action and is accountable for any profit the trustee made by reason of the breach.

20 Pa.C.S.A. § 7782(a), Uniform Law Comment.

"The requirement of loyalty of a trustee is the most intense fiduciary relationship in our law." *In re Holmes' Trust*, 392 Pa. 17, 21, 139 A.2d 548, 551 (1958). "In general, the trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary. The rule prohibits both self-dealing and conflicts of interest." *Paxson Trust, supra* at 119 (quoting *Estate of McCredy*, 470 A.2d 585, 597 (Pa.Super. 1983)). "It matters not that there was no fraud meditated and no injury done; the rule forbidding self-dealing is not intended to be remedial of actual wrong, but preventive of the possibility of it." *Id.* at 120 (quoting *In re Banes' Estate*, 452 Pa. 388, 396, 305 A.2d 723, 727 (1973)) (emphasis omitted). "Public policy requires this, not only as a shield to the parties represented, but as a guard against temptation on part of the representative." *Noonan's Estate, supra* at 33, 63 A.2d at 84 (quoting *Appeal of Chorpenning*, 32 Pa. 315, 316 (1858)).

There is no principle better settled than that a trustee is not permitted to obtain any **profit or advantage** to himself in managing the concerns of the *cestui que* trust.[18] It is a well-recognized general rule that a trustee or fiduciary may not use trust property for his own benefit and if he does he is liable to a *cestui que* trust for profits made by him from the use of trust property.

> [18] *Cestui que* trust is an alternative name for beneficiary. Black's Law Dictionary, 243 (6th ed.2004).

**Paxson Trust, supra** at 122 (internal citations and quotation marks omitted) (emphasis added).

"The test of forbidden self-dealing is whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it might have affected his judgment in a material connection[.]" **Id.** at 121 (quoting **In re Estate of Harrison**, 745 A.2d 676, 679 (Pa.Super. 2000), *appeal denied*, 563 Pa. 646, 758 A.2d 1200 (2000)).

> The prohibition against self-dealing is absolute; where the trustee violates it, good faith or payment of a fair consideration is not material. The situation is no different where the breach consists of the fiduciary's marked preference of a third person over the beneficiary in respect of a disposition of estate property. As in the case of self-dealing, such conduct constitutes a violation of the fiduciary's basic duty to the beneficiary.

**Noonan's Estate, supra** at 33, 63 A.2d at 84 (internal citations and quotation marks omitted). **See also In re Comerford's Estate**, 388 Pa. 278, 294, 130 A.2d 458, 466 (1957) (stating trustee is under duty to beneficiary in administering trust not to be guided by interest of any third party). "Thus, the trustee must neither 1) deal with trust property for the

benefit of himself or third parties, nor 2) place himself in a position inconsistent with the interests of the trust." **Paxson Trust, supra** at 119 (quoting **Estate of McCredy, supra** at 597).

"Once self-dealing is established, a surcharge may be applied to a fiduciary, not as compensation for any loss to the estate, but as punishment for the fiduciary's improper conduct." **Trust Under Will of Augustus T. Ashton, Deceased Dated January 20, 1950**, 669 Pa. 25, 41, 260 A.3d 81, 91 (2021) (quoting **Estate of Harrison, supra** at 680). In **Ashton**, our Supreme Court provided additional discussion about challenges to a trustee's self-dealing in cases where the transactions do not actually harm the trust *corpus*:

> The above description reflects precepts which are established in the law of trusts, and which rest on a presupposition that a breach of trust gives rise to an independent injury relative to any beneficiary who holds an equitable interest in the trust *res*. If this were not so, it would be difficult to explain how **any** party has standing to challenge transactions that amount to self-dealing which do not actually harm the trust *corpus*; yet under Pennsylvania law, self-dealing by a fiduciary can indeed be challenged in such instances. These principles would be substantially undermined, moreover, if this Court were to impose a monetary-harm overlay as a prerequisite to a request for equitable relief, or to endorse a proportionality test….
>
> \* \* \*
>
> [L]imiting standing in [these types of cases] could also lead to unintended consequences. For example, in a trust similar to the one presently at issue … the trustee could divert substantial monies to its own benefit through deliberate self-dealing. This conduct could then be insulated from challenge by any of the named beneficiaries due to a

- 17 -

threshold requirement that, in order to litigate, the beneficiary must establish personal monetary harm in addition to harm to the trust. Notably, these are the types of competing social policy considerations the Legislature is better positioned than this Court to evaluate and balance. If that body ultimately concludes that these factors should be resolved in a manner that denies equitable relief absent a certain predicate showing of injury, it has the power to enact legislative changes which embody such a determination.

*Id.* at 41-43, 260 A.3d at 91-92. (internal citations and footnotes omitted) (emphasis in original).

Many of these concepts are embodied in the Restatement (Third) of Trusts, which provides:

### § 100 Liability of Trustee for Breach of Trust

\* \* \*

A trustee who commits a breach of trust is chargeable with

(a)   the amount required to restore the values of the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered; or

(b)   the amount of any **benefit** to the trustee personally as a result of the breach.

Restatement (Third) of Trusts § 100 (emphasis added).  ***See also In re Scheidmantel***, 868 A.2d 464, 493 (Pa.Super. 2005) (evaluating Restatement (Second) of Trusts when analyzing appellate issue concerning propriety of surcharge imposed on trustee).

Instantly, the Orphans' Court aptly analyzed the applicable statutes and relevant case law to determine that it could award a surcharge against a

trustee equal to the total financial benefit at issue:

> [T]he words of section 7781(b)(3) are very clear: **the trustee, to remedy a breach of trust, may be ordered by the court, to compel the trustee to redress the breach of trust by paying money, restoring property, or other means**. Thus, [there is no language] in this statute which limits the recovery of money damages to profits. Reading these statutes in conjunction clearly provides sufficient support for [the Orphans'] Court's May 12, 2023 Order. If trustees can be held statutorily liable for their fiduciary breaches, the court is necessarily authorized to redress fiduciary breaches by requiring the trustee to pay money or impose some other sanctions. … Reading the word "profit" into the statue and limiting the recourse to only "profit" would not provide every provision of the statute with effect. When section 7781 and section 7782 are read in conjunction, it necessarily follows that a court can redress a breach through any appropriate means, including a surcharge, which holds the trustee liable for the benefits his improper actions conferred on himself or another.
>
> Finally, we note the wisdom of our Supreme Court's decision in **Raybold v. Raybold**[, 20 Pa. 308, 312 (1853)], which provides that "there is no … principle [better] settled than that a trustee is not permitted to obtain any **profit or advantage** to himself in managing the concerns of the *cestui que* trust." … Since the court may look to the Restatements of Trusts for support in a surcharge action, the Restatements further provide guidance for the terms stated herein above, which include the terms "profit" and "benefit."

(Orphans' Court Opinion at 14) (emphasis in original).

Following our own review, we conclude that the Orphans' Court's decision is free from legal error. **See Trust of Middleton, supra**. We also note our disagreement with Trustee's policy argument, wherein he suggests that a surcharge based on the amount of "benefit" is overly broad and more difficult to calculate than pure "profit." Our case law makes clear that any

- 19 -

concerns regarding a factfinder's ability to determine the amount of "benefit" are outweighed by the need for punitive mechanisms to guard against the temptation for trustees to engage in self-dealing. ***See Noonan's Estate, supra***. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/9/2025